**OFFICE OF PUBLIC UTILITY COUNSEL, Petitioner,**

v.

**The PUBLIC UTILITY COMMISSION OF TEXAS and West Texas Utilities Company, Respondents.**

**No. D–0679.**

Supreme Court of Texas.

Argued Sept. 13, 1993.

Decided June 22, 1994.

does not apply to exemplary damages resulting from malice . . . or to an intentional tort.

Luis A. Wilmot, San Antonio and Stephen Fogel, Austin, for petitioner.

Dan Morales, Susan D. Bergen, W. Scott McCollough, Austin, Ferd C. Meyer, Harry M. Reasoner, Houston, Kenneth C. Raney, Dallas, Davison W. Grant, Nancy Leshikar, R. Michael Anderson, Joe N. Pratt, and W.N. Woolsey, Austin, for respondents.

Justice ENOCH delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justices HIGHTOWER, HECHT and CORNYN join.

Justice GAMMAGE not sitting.

This is an administrative appeal from a final order of the Texas Public Utility Commission (Commission) which granted West Texas Utilities' (WTU) request for deferred accounting treatment for certain costs related to a new generating plant, Oklaunion Power Station Unit No. 1 (Oklaunion).[1] The question presented by this case is whether the Commission has the authority under the Public Utility Regulatory Act (PURA)[2] to allow a public utility to defer certain costs incurred during the "regulatory lag" period in order to avoid measurable harm to the utility's financial condition.[3] We answer this no, and consequently reverse the judgment

---

1. Tex.Public Utils.Comm'n, *Petition of West Texas Utilities Company for Deferred Accounting Treatment of Certain Oklaunion Related Costs*, Docket No. 7289, 15 Tex.P.U.C.Bull. 290 (September 11, 1987) (Docket No. 7289).

2. Tex.Rev.Civ.Stat.Ann. art. 1446c (Vernon Supp. 1994).

3. Generally, regulatory lag is the delay between the time when a utility's profits are above or below standard and the time when an offsetting rate decrease or rate increase may be put into

effect by commission order or otherwise. This delay is due to the inherent inability in the regulatory process to allow for immediate rate decreases or increases. For purposes of this opinion, "regulatory lag" is the period between the date a new plant begins commercial operation (the "in-service" date) and the effective date of the new rates that result from including the new plant's costs in the rate base. *See* James C. Bonbright et al., Principles of Public Utility Rates 96 (2d ed. 1988).

of the court of appeals and remand this cause to the Commission for further proceedings consistent with this opinion.

On December 24, 1986, WTU placed the Oklaunion power plant into commercial service. Under standard accounting procedures, WTU would have stopped accruing carrying costs on its invested funds and would have begun charging operations and maintenance, depreciation, and taxes (collectively "operating costs") as expenses against income at this time. During the interval between the time Oklaunion was placed in service and the time the investment in the plant would be included in rate base (i.e., the "regulatory lag" period), WTU would have incurred carrying costs and operating costs on its invested funds that it would never recover. As a result, WTU applied to the Commission for deferred accounting treatment of such costs during the regulatory lag period.

In Docket No. 7289, the Commission granted WTU's request for deferred accounting treatment for a period from December 24, 1986, until rates became effective that reflected the costs of the plant. By granting deferred accounting treatment, the Commission allowed WTU to capitalize its costs associated with Oklaunion during the regulatory lag period and carry them as a separate asset on its balance sheet. The reasonableness of the amount of the costs was to be determined by the Commission in a separate ratemaking proceeding in which the balance-sheet asset consisting of the deferred costs would be reviewed using the same criteria as any other asset.

The Office of Public Utility Counsel (OPUC) sought judicial review of the Commission's order granting deferred accounting treatment to WTU. The trial court and the court of appeals affirmed. As stated and for the reasons below, we reverse the judgment of the court of appeals and remand this cause to the Commission for further proceedings consistent with this opinion.

## I.

### Accounting Proceeding v. Rate Proceeding

■ The OPUC argues that Docket No. 7289 was actually a ratemaking proceeding, and therefore, the Commission erred in failing to follow the ratemaking procedures set forth in PURA section 43. We disagree. In *State of Texas v. Public Utility Commission*, 883 S.W.2d 190 (Tex.1994), we held that the Commission's authorization of deferred accounting treatment for post-in-service costs does not constitute a ratemaking proceeding under PURA section 43. Thus, we overrule the OPUC's first point of error.

In an argument not presented by the parties in *State of Texas v. Public Utility Commission*, the OPUC contends that the Commission erred by failing to develop a record that would support its conclusion that shareholders did not receive just compensation during the period of deferred expenses but, instead, contributed funds for those expenses. The OPUC contends that the only way to develop a sufficient record is to make factual inquiries into ratemaking issues and that was not done in Docket 7289. The OPUC's argument mistakenly presupposes that Docket No. 7289 was a rate hearing. As noted, Docket No. 7289 involved a change in accounting procedures and did not constitute a ratemaking action. As we held in *State of Texas v. Public Utility Commission*, the Commission possesses the authority to grant deferred accounting treatment for post-in-service costs. 883 S.W.2d at 195. The Commission is not required to conduct a full rate hearing in order to determine whether to grant deferred accounting. Further, it is within the Commission's authority to hold a limited scope hearing to determine whether to allow deferred accounting. TEX.REV.CIV. STAT.ANN. art. 1446c, §§ 16, 27. *See City of El Paso v. Public Util. Comm'n of Texas*, 609 S.W.2d 574, 579 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.) (the Commission has a large degree of latitude in the methods it uses to accomplish its regulatory function).

In a related point of error, the OPUC argues that the scope of the hearing was too narrow because it did not allow the Commission to consider the total increases and decreases in costs of service or whether the

Oklaunion plant was used and useful.[4] Again, the OPUC mistakenly presupposes that the Commission must conduct a rate hearing in order to authorize deferred accounting. Pursuant to the scope established at the outset of the hearing, the Commission considered whether the deferral of post-in-service costs was necessary to protect WTU from measurable harm to its financial condition. The Commission's final order approving deferred accounting treatment explicitly provides that the deferred costs will be subject to review at a subsequent rate hearing and will be included in the rate base only to the extent that they are prudent, reasonable and necessary and are related to property that is used and useful in providing service.[5] As the court of appeals recognized, at the subsequent rate hearing the utility must also prove that all operating expenses have been actually incurred. 808 S.W.2d 497, 499. *Public Util. Comm'n v. Houston Lighting & Power,* 748 S.W.2d 439, 441–42 (Tex.1987), *appeal dism'd,* 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988). Thus, the deferred cost asset will be reviewed as any other asset at a subsequent rate hearing.

## II.

### PURA section 41; Test Year; Retroactive Ratemaking

■ The OPUC also argues that the Commission's approval of deferred accounting treatment violated the general prohibition against retroactive ratemaking, the test year requirement, and PURA section 41. In *State of Texas v. Public Utility Commission,* we held that the Commission's authorization of deferred accounting treatment for post-in-service costs does not violate any general prohibition against retroactive ratemaking, the test year requirement, or PURA section 41. 883 S.W.2d at 199. Thus, we reject OPUC's arguments on these points.

## III.

### Measurable Harm Standard

The Commission applied the following standard in determining whether to grant WTU's request for deferred accounting treatment:

1. Whether the company's current financial integrity is so fragile that it would not have access to the capital markets on reasonable terms unless it is allowed to continue to accrue AFUDC and defer the expenses associated with a new plant during the period of operation before rates are in effect that reflect the cost of the plant.

2. Whether the company's financial condition will be measurably harmed during the deferral period if it is not allowed to continue to accrue AFUDC and defer and capitalize the expenses related to the plant.

3. Whether the accounting treatment proposed by the company accords with GAAP.

Docket 7289, *supra* note 1, at 347 (Conclusion of Law 8). In applying this standard, the Commission considered first whether the financial integrity of the utility would be at risk if deferred accounting was not allowed. If not, the Commission would still grant the request if the utility's financial condition would be measurably harmed without deferred accounting. In order to establish

---

4. The OPUC also argues that the limited scope also prohibited the Commission from considering the effect of the deferred accounting issue on WTU's holding company, Central and Southwest Corporation (CSW). The OPUC claims that WTU's financial integrity is plainly dependent upon CSW's financial condition and expectations. While we do not disagree with this contention, we do not find OPUC's argument persuasive. It would not be fair to deny a utility deferred accounting treatment when its financial integrity was in fact at risk simply because its parent company was in a good financial condition. Likewise, it would be an abuse of discretion to grant deferred accounting treatment

when a utility's financial integrity was not at risk because the overall financial condition of the utility's parent company was weak.

5. The Commission's final order stated in pertinent part:

The capitalized costs will be subject to review by the Commission in WTU's rate case (Docket No. 7510), and they will be included in invested capital to the extent and only to the extent that the Commission determines that they are prudent, reasonable, and necessary expenses and that they are related to property that is used and useful in providing service.

measurable harm, the utility must establish that "a plant addition [is] so large relative to the size of the utility that it would normally require a utility to request a major rate change." *Id.* at 328–29, 347 (Conclusion of Law 9). The OPUC contends that the measurable harm standard is in reality a non-standard because any utility bringing a generation plant on line would be benefitted by deferred accounting treatment; thus, the impact on its financial condition would be "measurable." We agree.

In *State of Texas v. Public Utility Commission*, we held that the Commission possesses the authority under PURA to authorize deferred accounting treatment. 883 S.W.2d at 197. However, this authority is not unfettered. Because regulatory lag is ordinarily an element of risk associated with investment in a utility, *Railroad Comm'n of Texas v. Lone Star Gas Co.*, 656 S.W.2d 421, 427 (Tex.1983), it should be alleviated only if necessary to carry out the provisions of PURA. *See* TEX.REV.CIV.STAT.ANN. art. 1446c, § 43; *State of Texas v. Public Util. Comm'n*, 883 S.W.2d at 195 ("... if the effects of regulatory lag infringe on the Commission's ability to regulate in a manner necessary to carry out the provisions of PURA, then the Commission may respond within its powers, both express and implied, under PURA to alleviate the impact of regulatory lag in order to fulfill its statutorily imposed duties").

In *State of Texas v. Public Utility Commission*, we held that the Commission did not abuse its discretion by authorizing deferred accounting treatment when the financial integrity of the utilities was at risk. Under PURA section 39, a utility must be allowed a reasonable opportunity to recover its operating expenses together with a reasonable return on its invested capital. TEX.

REV.CIV.STAT.ANN. art. 1446c, § 39 (Vernon Supp.1994); *Railroad Comm'n of Texas v. High Plains Natural Gas Co.*, 628 S.W.2d 753, 753 (Tex.1981). This requirement is met only if the return is sufficient to assure confidence in the financial integrity of the enterprise so as to maintain its credit and to attract capital. *Suburban Util. Corp. v. Public Util. Comm'n*, 652 S.W.2d 358, 362 (Tex. 1983); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of the State of West Virginia*, 262 U.S. 679, 692–93, 43 S.Ct. 675, 678–79, 67 L.Ed. 1176 (1923). As a result, the financial integrity standard applied by the Commission in *State of Texas v. Public Utility Commission* ensured that the utilities would receive an opportunity to recover the minimum rates mandated by PURA. 883 S.W.2d at 195.

■ Unlike the financial integrity standard, however, the measurable harm standard does not address the fundamental statutory requirement that a utility must have a reasonable opportunity to recover the minimum rates required by PURA. *See* TEX. REV.CIV.STAT.ANN. art. 1446c, § 39 (utility must be allowed a reasonable opportunity to recover its operating expenses together with a reasonable return on its invested capital); *Railroad Comm'n of Texas v. High Plains Natural Gas Co.*, 628 S.W.2d 753 (Tex.1981). Thus, the measurable harm standard lacks a foundation in the regulatory scheme provided by PURA. As a result, although the Commission possesses the authority to authorize deferred accounting treatment, we conclude that the application of a measurable harm standard to determine whether to allow deferred accounting is an abuse of discretion.[6]

---

6. We note that in subsequent dockets the Commission itself concluded that the measurable harm standard was too speculative. *See, e.g.,* Tex.Public Utils.Comm'n, *Petition of Houston Lighting and Power Company for Approval of Deferred Accounting Treatment for Limestone Unit 2 and the South Texas Project Unit 1,* Docket No. 8230, 14 TEX.P.U.C.BULL. 2752, 2811 (April 19, 1989). In Docket No. 8230, the Examiner concluded that the measurable harm standard *should* no longer be used because:

1. the absence of a clear definition of measurable harm offers no yardstick against which a utility may measure the appropriateness of deferred accounting requests; this absence in this case resulted in allegations of measurable harm that are too speculative to rise to the level of credible evidence;

2. a standard such as "measurable harm" that can be supported by speculative evidence is excessively and impermissibly lenient, con-

WTU argues that contrary to the OPUC's argument that "measurable harm" would only require proof of some harm, no matter how slight, in Docket No. 7289 the Commission applied the standard in a manner requiring proof of substantial harm.[7] We recognize that WTU's financial condition will be negatively impacted if deferred accounting is not allowed. However, the Commission did not make a formal finding as to whether WTU's financial integrity would be jeopardized without deferred accounting. As a result, we cannot conclude that the Commission held WTU to the higher financial integrity standard.

### IV.

### Conclusion

We hold that the Commission abused its discretion by applying a measurable harm standard to determine whether to authorize deferred accounting treatment for post-in-service costs. Consequently, we reverse the judgment of the court of appeals and remand this cause to the Commission for reconsideration in light of our holding in *State of Texas v. Public Utility Commission*, 883 S.W.2d 190.

Justice SPECTOR, joined by Justice GONZALEZ, and Justice DOGGETT, concurring.

I agree that this cause must be remanded to the Public Utility Commission for reconsideration. I disagree, however, with the majority's holding regarding the actions the Commission may take on remand. I would hold that the Public Utility Regulatory Act, TEX.REV.CIV.STAT.ANN. art. 1446c (Vernon Supp.1994), does not allow the Commission to authorize deferred accounting treatment for

post-in-service costs under any standard. *See State of Texas v. Public Utility Commission*, 883 S.W.2d 190, 195 (Tex.1994) (Spector, J., dissenting). For that reason, I join in the Court's judgment only.

---

sidering the enormous amount of revenue involved and the potential ratepayer impact.

7. WTU cites to the Examiner's report summarizing the reasons for recommending deferred accounting:

In the examiner's opinion, the harm shown far exceeds the harm necessary to obtain approval of deferred treatment, and the approval is warranted for any one of the following reasons: First, it is apparent that WTU's financial indicators would not maintain the company's current bond rating: the return on equity would

be 5.7 percent; interest coverage, 2.17X; and net cash flow to permanent capital, 4.96 percent. Second, the amount of the expenses WTU seeks to defer is a substantial amount for any company of its size. The testimony of Mr. Conners is impressive: the estimated deferred expenses are two-thirds of the company's net income and almost one-third of its retained earnings. Third, without deferral treatment, WTU will have to forego paying a fourth-quarter common dividend....

*See supra* note 1, at 340 (Examiner's report).