WEST TEXAS UTILITIES COMPANY
and Public Utility Commission of
Texas, Appellants

v.

OFFICE OF PUBLIC UTILITY COUN-
SEL, City of Sonora, City of San Angelo,
State of Texas, City of Abilene, City of
Childress, City of Cisco, City of Eden,
City of Estelline, City of Haskell, City of
Melvin, City of Stamford, and City of
Winters, Appellees

and

OFFICE OF PUBLIC UTILITY COUN-
SEL, City of Abilene, City of Childress,
City of Cisco, City of Eden, City of Es-
telline, City of Haskell, City of Melvin,
City of Stamford, and City of Winters,
Appellants

v.

PUBLIC UTILITY COMMISSION OF
TEXAS and West Texas Utilities
Company, Appellees.

No. 03-93-00222-CV.

Court of Appeals of Texas,
Austin.

Feb. 15, 1995.

Rehearing Overruled April 26, 1995.

Steven A. Porter, Butler, Porter, Gay & Day, Austin, for Cities of Abilene, et al., appellants/appellees.

Stephen Fogel, Associate Public Counsel, Office of Public Utility Counsel, Austin, for Office of Public Utility Counsel, appellant/appellee.

Susan Bergen Schultz, Asst. Atty. Gen., Energy Div., Austin, for Public Utility Com'n, appellant/appellee.

Joe N. Pratt, Davison W. Grant, R. Michael Anderson, Broyles & Pratt, P.C., Austin, for West Texas Utilities Co., appellant/appellee.

Jim Boyle, Boyle & Bender, Austin, no brief filed, for Cities of Sonora and San Angelo.

Karen E. Young, Asst. Atty. Gen., Public Agency Representation, Austin, no brief filed, for State of Tex.

Rex D. VanMiddlesworth, Mayor, Day, Caldwell & Keeton, L.L.P., Houston, no brief filed, for Texas Indus. Energy Consumers.

Before CARROLL, C.J., and ABOUSSIE and B.A. SMITH, JJ.

CARROLL, Chief Justice.

This is an appeal from a final order of the Texas Public Utility Commission (the "Commission") dated November 30, 1987, which established electric rates for West Texas Utilities Company ("WTU"). *See* Tex. Public Util. Comm'n, *Application of West Texas Utilities Company for Authority to Change Rates,* Docket No. 7510, 14 Tex.P.U.C.Bull. 620 (Nov. 30, 1987) ("Docket 7510"). After a hearing, the Commission issued an order pursuant to the Public Utility Regulatory Act, Tex.Rev.Civ.Stat.Ann. art. 1446c (West Supp.1995) (hereinafter "PURA"). Three aspects of the Commission's order are challenged on appeal: (1) the Commission's grant of WTU's request to include in the utility rate base certain deferred costs incurred during the "regulatory lag" period;[1] (2) the Commission's decision to adopt certain depreciation rates based on rates set in another docket; and (3) the Commission's grant of WTU's request to establish a surcharge of rate case expenses for customers of municipalities that intervened in the rate case. We will supply relevant facts from the record throughout this opinion as we address each of the three issues.

The district court affirmed the order in part and reversed in part. We will affirm the district-court judgment in part and reverse in part.

## PROCEDURAL BACKGROUND

On December 23, 1986, WTU filed a petition seeking approval of deferred accounting treatment for certain costs related to Oklaunion Power Station No. 1 ("Oklaunion"), a coal-fired generating plant. *See* Tex. Public Util. Comm'n, *Petition of West Texas Utilities Company for Deferred Accounting Treatment of Certain Oklaunion Related Costs,* Docket No. 7289, 15 Tex.P.U.C.Bull. 290 (Sept. 11, 1987) ("Docket 7289"). The petition sought a Commission order that would allow WTU to accrue a deferred return and to defer depreciation, operation and maintenance expenses, and taxes on Oklaunion from the time of Oklaunion's commercial operation date of December 24, 1986 until the time that rates reflecting Oklaunion's addition to the rate base went into effect.[2] The estimated amount of these charges was $28,-400,700. The hearing on the merits began on May 18, 1987 and concluded on May 20, 1987. The Commission issued its order on September 11, 1987, allowing WTU to capitalize the costs associated with Oklaunion during the regulatory lag period and carry them as a separate asset on its balance sheet. The reasonableness of the amount of these costs was to be determined by the Commission in a separate ratemaking proceeding, Docket 7510.[3] The Office of Public Utility Counsel ("OPUC") appealed the Docket 7289 order and pursued its legal remedies in that case in a separate cause of action.[4]

1. The Texas Supreme Court has defined regulatory lag:

 Generally, regulatory lag is the delay between the time when a utility's profits are above or below standard and the time when an offsetting rate decrease or increase may be put into effect by commission order or otherwise. This delay is due to the inherent inability in the regulatory process to allow for immediate rate decreases or increases. For purposes of this opinion, "regulatory lag" is the period between the date a new plant begins commercial operation (the "in-service" date) and the effective date of the new rates that result from including the new plant's costs in the rate base.

 *Office of Pub. Util. Counsel v. The Pub. Util. Comm'n,* 888 S.W.2d 804, 805 n. 3 (Tex.1994) (citing James C. Bonbright *et al., Principles of Public Utility Rates* 96 (2d ed. 1988)).

2. Under standard accounting procedures, WTU would have stopped accruing carrying costs on

its invested funds and would have begun charging operations and maintenance, depreciation, and taxes (collectively "operating costs") as expenses against income at the time the company placed the plant into commercial service. During the regulatory lag period, WTU would have incurred carrying costs and operating costs on its invested funds that it never would recover.

3. Docket 7510 is the rate case at issue in this appeal.

4. The Texas Supreme Court has recently decided the case in *Office of Public Utility Counsel v. The Public Utility Commission,* 888 S.W.2d 804 (1994). In its appeal, OPUC challenged the Commission's authority under PURA to allow a public utility to defer certain costs incurred during the regulatory lag period in order to avoid measurable harm to the utility's financial condition. The court agreed with OPUC that the

On May 19, 1987, in accordance with section 43(a) of PURA, WTU filed with the Commission its application for authority to increase its electric utility rates a total of $50,361,475 in all unincorporated areas in which it served and in those incorporated areas that had ceded jurisdiction to the Commission. WTU's application was designated Docket 7510. Simultaneously, WTU filed identical statements of intent to implement rate increases within those municipalities retaining original jurisdiction over the rates of WTU and appealed the rates within those incorporated areas.[5] See PURA §§ 17, 26 (West Supp.1995). WTU applied for the rate increase primarily to recover expenditures incurred in the completion and operation of the Oklaunion plant. Some of these expenditures included costs that WTU had capitalized and deferred as a separate asset during the regulatory lag period.[6]

Hearings were held from August 24 to September 16, 1987. On November 6, 1987, the examiners issued a report recommending a $32,011,167 increase. The Commission issued its order on November 30, 1987 with modifications to the Examiners' Report. On January 12, 1988, the Commission issued an order clarifying its November 30 order and an order denying all motions for rehearing. Seven separate, nonconsolidated appeals pending from Docket 7510 were filed in the district court, which combined the proceedings of seven causes of action for hearing but did not consolidate the causes. See Tex. R.Civ.P. 174(a). The district court issued an order in each cause of action affirming in part and reversing in part the Commission order in Docket 7510. In this Court, the parties filed an agreed motion to consolidate the seven appeals perfected from the seven district-court orders.

## DEFERRED OKLAUNION COSTS

This case is one of a number of appeals dealing with the Commission's use of deferred charges for new power plants. Deferred charges are the operation and maintenance expenses, insurance expenses, taxes, and carrying costs [7] that a utility incurs for a new power plant during the period between the date a new plant begins commercial operation and the effective date of the new rates that result from including the new plant's costs in the rate base. The Commission follows a two-step process for deferred charges. First, it gives the utility permission to record the charges. After the utility has recorded the charges, the Commission gives the utility permission to recover the charges. The deferred costs recorded by the utility are subject to review at the subsequent rate hearing; the costs are included in the rate base only to the extent that the rate base will permit each utility "a reasonable opportunity to earn a reasonable return on its invested capital used and useful in rendering service to the public over and above its reasonable operating expenses." PURA § 39(a) (West Supp.1995). In Docket 7289, the Commission allowed WTU to record deferred charges for the new Oklaunion power plant. This appeal involves the recovery of those charges permitted in Docket 7510.

"measurable harm standard" is in reality a non-standard" and determined that it "lacks a foundation in the regulatory scheme provided by PURA." Id. at 808, 808–09. However, the court concluded that PURA empowered the Commission to allow a public utility to defer costs if it was necessary to the financial integrity of the utility. Id. at 807–08. Thus, the court reversed and remanded the case so that the Commission could consider whether WTU's financial integrity would be jeopardized without deferred accounting.

5. WTU appealed the rates of the following municipalities, which retained original ratemaking jurisdiction: Abilene, Alpine, Anson, Aspermont, Baird, Ballinger, Balmorhea, Benjamin, Big Lake, Blackwell, Bronte, Buffalo Gap, Childress, Cisco, Clarendon, Clyde, Cross Plains, Crowell, Dodson, Eden, Estelline, Hamlin, Haskell, Hawley, Impact, Iraan, Jayton, Junction, Knox City, Lawn, Lueders, Melvin, Memphis, Menard, Merkel, Munday, O'Brien, Paducah, Putnam, Quana, Rankin, Rochester, San Angelo, Santa Anna, Sonora, Spur, Stamford, Sterling City, Throckmorton, Tuscola, Tye, Vernon, Wellington, Winters, and Woodson.

6. In Docket 7289, the Commission determined that it was legal and appropriate to issue an order permitting deferred accounting treatment; in Docket 7510, the Commission then included the results of that deferral order in WTU's rates.

7. Carrying costs represent an allowance for funds used during construction.

In Docket 7510, the Commission allowed WTU to recover deferred charges for the Oklaunion plant, including carrying costs. On appeal, the district court affirmed the Commission's decision to include in the rate base and permit recovery of deferred operating and maintenance costs, depreciation, and taxes. However, the district court reversed the Commission's decision to the extent that the Commission had allowed WTU to place deferred carrying costs in the rate base. The district court based its judgment upon this Court's opinion in *City of El Paso v. Public Utility Commission*, 839 S.W.2d 895 (Tex.App.—Austin 1992) (holding that the Commission can allow a utility to recover all deferred charges except deferred carrying costs), *aff'd in part & rev'd in part*, 883 S.W.2d 179 (Tex.1994).

The district court correctly applied our holding in *City of El Paso*; however, the supreme court has since modified our decision on deferred charges, holding that the Commission has the authority to include deferred costs, including carrying costs, in the rate base. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179 (Tex.1994).[8] In two recent opinions, the supreme court has confirmed that deferred accounting practices and the inclusion of deferred post-in-service carrying and operating and maintenance costs do not violate the language or purpose of PURA section 41(a),[9] the rule against retroactive ratemaking, the historical test-year requirement, or the rule against single-issue ratemaking. *See State of Tex. v. Public Util. Comm'n*, 883 S.W.2d 190, 198–201 (Tex.1994); *City of El Paso*, 883 S.W.2d at 187–88.

In *City of El Paso*, the supreme court ruled that the Commission "possesses the authority to allow a utility to defer post-in-service costs, in order to protect the utility's financial integrity." 883 S.W.2d at 187. In

*State of Texas v. Public Utility Commission*, 883 S.W.2d 190 (Tex.1994), the supreme court held that the Commission's authority to alleviate regulatory lag by allowing deferred accounting "is not unfettered." *Id.* at 196. The court concluded that because the allowance of deferred accounting enables the Commission to carry out the provisions of PURA, especially section 39, which is intended to ensure utilities' financial integrity, deferred accounting is permissible—but only if the financial integrity of the utility were at risk. *See id.* (holding that "the financial integrity of the utilities was at risk due to the effect of extraordinary regulatory lag"). Thus, the Commission's duty is to determine to what extent deferred accounting is necessary to preserve the utility's financial integrity.

■ WTU and the Commission argue that when the utility sought permission to account for deferred costs in Docket 7289, the Commission determined that deferral was required by financial integrity demands. However, the supreme court disagreed and reversed the Commission's Docket 7289 decision in *Office of Public Utility Counsel v. The Public Utility Commission*, 888 S.W.2d 804 (1994). In *Office of Public Utility Counsel*, the supreme court confirmed the legality of deferred accounting but ruled that the Commission abused its discretion in Docket 7289 because it applied a "measurable harm" standard instead of a "financial integrity" standard to determine whether to authorize deferred accounting. 888 S.W.2d at 807–09; *see also City of El Paso*, 883 S.W.2d at 189 n. 20. That case has been remanded to the Commission for it to decide whether deferred accounting is necessary to preserve the financial integrity of the utility. *Office of Pub. Util. Counsel*, 888 S.W.2d at 808–09.

8. All parties concede that the supreme court's opinion in *City of El Paso* controls the outcome of the appeal on this issue.

9. Section 41 provides:
(a) Invested Capital. Utility rates shall be based upon the original cost of property used and useful to the public utility in providing service including construction work in progress on the books of the utility.... Original cost shall be the actual money cost, or the

actual money value of any consideration paid other than money, of the property at the time it shall have been dedicated to public use, whether by the utility which is the present owner or by a predecessor, less depreciation.
Cities and OPUC argue that deferred charges cannot be considered invested capital because they were incurred after Oklaunion was dedicated to public use, i.e., after the plant began operation.

The supreme court has made it clear that the Commission must apply the financial integrity standard not only at the accounting hearing, but also at the subsequent rate hearing:

> [T]he financial integrity standard must not be used merely as a threshold inquiry that once met, is never considered again. Under our holding today, the Commission must not alleviate regulatory lag unless necessary to comply with the provisions of PURA.... While this requirement is met by application of the financial integrity standard in an accounting hearing, it cannot be disregarded at the subsequent rate hearing. Rather, at the subsequent rate hearing, after the Commission determines what portion of the deferred expenses were prudently and reasonably incurred and related to property used and useful in providing services, the Commission must then determine to what extent the deferred costs are necessary to preserve the utilities' financial integrity.

*State v. Public Util. Comm'n*, 883 S.W.2d at 202 (citation omitted).[10] In Docket 7510, the Commission failed to determine to what extent deferred costs are necessary to preserve WTU's financial integrity.

Accordingly, we reverse those portions of the district court's judgment relating to deferred Oklaunion charges and render judgment reversing the Commission's order concerning deferred charges. We remand the cause to the Commission for reconsideration in light of its forthcoming decision in Docket 7289, in which it must decide whether to grant WTU's request for deferred accounting

based upon the financial integrity standard. If the Commission determines in Docket 7289 that deferred accounting *is not necessary* to preserve WTU's financial integrity, the Commission can include *none* of the deferred costs in the rate base in Docket 7510.[11] On the other hand, if the Commission concludes in Docket 7289 that deferred accounting *is necessary* to preserve WTU's financial integrity, the Commission may properly include deferred costs, *including carrying costs,* in the rate base after it determines to what extent the deferred costs are necessary to preserve WTU's financial integrity. *See id.*

## NON–OKLAUNION DEPRECIATION RATES

We must next decide whether the district court properly affirmed the Commission's determination of non-Oklaunion depreciation rates.[12] WTU's existing non-Oklaunion depreciation rates had been set by the Commission in Docket 5204,[13] a proceeding in which appellants City of Abilene *et al.* ("Cities") participated. Therefore, during the Docket 7510 rate hearing, WTU submitted extensive testimony only on the depreciation rate for the Oklaunion plant and proposed that the Commission continue to apply the non-Oklaunion depreciation rates set in Docket 5204. Cities responded with a recommended adjustment to the non-Oklaunion depreciation rates, which was rejected as unreliable by the Commission. After reviewing the evidence, the Commission determined in Finding of Fact 122:

---

10. The Commission stated in its unchallenged Finding of Fact 33 that the deferred Oklaunion charges "constitute prudent, reasonable and necessary expenses and return related to property which is used and useful in providing service." Neither OPUC nor Cities contend that the Commission's finding is arbitrary and capricious or unsupported by substantial evidence in the record. Thus, the Commission need not revisit this issue on remand.

11. Absent the Commission's permission to record deferred costs in Docket 7289, there are no deferred costs to include in the rates in Docket 7510.

12. Non–Oklaunion depreciation rates include all of WTU's depreciation rates except the depreciation rates for the coal-fired Oklaunion generating

station, which are not at issue in this appeal. Consequently, the depreciation rates at issue in this appeal are those for the non-Oklaunion production plant and nine accounts in the transmission, distribution, and general plant categories.

13. The depreciation rates approved in Docket 5204 were based upon a depreciation study performed by WTU utilizing plant information as of December 31, 1982. The final order in Docket 5204 was issued in December 1983 and was not appealed. Though the study was performed in 1983, it has been referred to as the 1982 study because the study was based on 1982 year-end data.

[T]he depreciation expense figure for non-Oklaunion plant approved by the Commission in Docket No. 5204 and presented by WTU in this case, [is] reasonable and supported by a preponderance of the evidence. The adjustments to depreciation expense proposed by the Cities should be rejected as unreliable since the Cities selectively updated only one element of WTU's 1983 depreciation study regarding non-Oklaunion production plant, selectively chose to update only those items which would decrease the depreciation rate, and otherwise simply challenged the methodology employed by WTU in its study which has previously been approved by the Commission.

■ In three points of error, Cities contend that the Commission erred in adopting the non-Oklaunion depreciation rates set in Docket 5204 without evidence of the present reasonableness of the depreciation rates and that the Commission erred in failing to include findings of fact regarding the reasonableness of the depreciation rates in violation of section 2001.141(b) of the Administrative Procedure Act (the "APA").[14] Cities argue that WTU cannot rely on the record evidence supporting the non-Oklaunion depreciation rates set five years earlier in Docket 5204 and its companion case, Docket 5764, because the December 1982 study supporting the non-Oklaunion depreciation rates established in Docket 5204 was not introduced into evidence by WTU and because WTU failed to establish that the five-year-old depreciation rates were still reasonable in 1987. Cities contend that their experts demonstrated that changes had occurred in certain underlying factors used in the 1982 study and that

WTU's own filing package, Schedule G-6.2, which included updated information on the expected service lives of WTU's generating units, established that the 1982 rates were outdated and therefore not reasonable.

The Commission sets utility rates at a level that will enable the utility to recover a certain rate of return.[15] Actual operating costs subsequent to a rate case may cause the utility's rate of return to fluctuate above or below the target established by the Commission. Therefore, PURA provides affected persons with the ability to ask the Commission to adjust rates to a level that will provide the target rate of return. *See* PURA § 42 (West Supp.1995). PURA places the burden of proof on the public utility to prove that its proposed rate is just and reasonable. PURA § 40 (West.Supp.1995).

■ The Commission is obligated to examine all components of cost of service, including depreciation, in setting rates. The Commission is specifically required by statute to "fix proper and adequate rates and methods of depreciation ... of the several classes of property of each public utility, and shall require every public utility to carry a proper and adequate depreciation account in accordance with such rates and methods ... as the commission prescribes." PURA § 27(b) (West Supp.1995). A depreciation rate is an accounting device.[16] The Commission sets depreciation rates on a company-specific basis that is not subject to the external factors which affect the rate of return.

■ In challenging the Commission's findings, Cities erroneously concentrate on the burden of proof in Commission rate proceedings.[17] The appropriate focus for our inquiry

---

**14.** Tex.Gov't Code Ann. § 2001.141(b) (West 1995). All citations in this opinion are to the current Administrative Procedure Act ("APA") rather than the former Administrative Procedure and Texas Register Act because the recent recodification did not substantively change the law.

**15.** Section 39(a) of PURA requires that in setting a public utility's rates, the Commission "shall fix its overall revenues at a level which will permit such utility a reasonable opportunity to earn a reasonable return on its invested capital used and useful in rendering service to the public over and above its reasonable and necessary operating expenses." PURA § 39(a) (West Supp.1995).

**16.** "Depreciation rate" means the percentage of investment in a plant that should be recognized annually as a depreciation expense; depreciation expense, a dollar figure, is the result of applying the depreciation rate to the plant account balances, which are also dollar figures.

**17.** Cities accurately state that section 40 of PURA places the burden of proof in Commission rate proceedings on the utility attempting to increase its rates.

is the well-recognized regulatory concept of "changed circumstances." Absent a showing of changed circumstances, the Commission is generally prohibited from revisiting its prior final orders. *See Railroad Comm'n v. Aluminum Co. of Am.,* 380 S.W.2d 599, 602–03 (Tex.1964); *see also Public Util. Comm'n v. Brazos Elec. Power Coop., Inc.,* 723 S.W.2d 171, 173 (Tex.App.—Austin 1986, writ ref'd n.r.e.) (holding that the Commission does not have authority to review a former final order on the same fact situation); *South Tex. Indus. Servs., Inc. v. Texas Dep't of Water Resources,* 573 S.W.2d 302, 304 (Tex.Civ. App.—Austin 1978, writ ref'd n.r.e.) ("It is ... well settled that an agency has the right to reopen a matter and enter a different order upon a showing of changed circumstances; however, the agency does not have the authority to review a former order upon the same fact situation.").

The Texas Supreme Court explained the rationale underlying the changed-circumstances doctrine in *Coalition of Cities for Affordable Utility Rates v. Public Utility Commission,* 798 S.W.2d 560 (Tex.1990). That case involved an attempt by a public utility to have a second proceeding before the Commission concerning the prudence of the utility's investment in a nuclear power plant.[18] Holding that doctrines of res judicata and collateral estoppel precluded the utility from relitigating the prudence of its past investments, the court explained:

All parties were entitled to a straightforward decision from the PUC the first time that this case was presented. Permitting relitigation offends the policy reasons supporting the doctrines of *res judicata* and collateral estoppel. Both a public utility and consumers benefit from a final decision about whether cost overruns at a power plant have been sufficiently justified. *With a complex and controversial project like a nuclear power installation, a utility and its investors need a determination to prevent relitigation of the same previous investment decision on each occasion that a rate increase is requested.* The same finality that benefits the utility investors

can serve the benefits of consumers who know that if a utility is once denied relief because of its failure to prove its case, it may not return repeatedly on the same facts until the PUC yields.

*Id.* at 565 (emphasis added).

This rationale applies in the present case. In Docket 5204, the Commission issued a final unappealed order setting the non-Oklaunion depreciation rates. All parties, including Cities, were bound by the Commission's prior decision in Docket 5204 regarding non-Oklaunion depreciation rates absent a showing of changed conditions that would necessitate an adjustment in those depreciation rates. WTU's expert witness John Ferguson provided evidence that supports the Commission's determination to continue to apply the Docket 5204 non-Oklaunion depreciation rates even though one factor—retirement dates—had changed. When asked whether he recommended adoption of updated depreciation rates, Ferguson testified:

[T]here is reason not to make rate changes at this time. The report of the 1982 study recommended that a new study be conducted during 1988. A pending change in how WTU calculates the salvage value of reused materials suggests that the study be delayed one year. The need to conduct a depreciation study of all property during 1989 is a reason for not changing the Production Plant rates now.

While Cities produced *some evidence* that changed circumstances required the 1982 rates to be amended and the expenses adjusted, the Commission concluded that Cities failed to prove changed circumstances required a reexamination of the prior depreciation rates and that Cities did not rebut WTU's evidence in support of the Commission's decision. Once the Commission hears and considers evidence, it may refuse to credit that evidence. *City of Frisco v. Texas Water Rights Comm'n,* 579 S.W.2d 66, 69 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). The Commission was not bound to accept the testimony of Cities' witnesses, ex-

---

18. The Commission had determined in the original rate case that the utility failed to prove that all of its expenses were prudently incurred.

pert or non-expert. *See Railroad Comm'n v. Lone Star Gas Co.,* 611 S.W.2d 908, 911 (Tex.Civ.App.—Austin 1981, writ ref'd n.r.e.). The Commission was therefore free to reject Cities' evidence and accept the testimony of Ferguson, thus finding that WTU's existing depreciation rates were appropriate and should not be adjusted.[19]

■ In its final point of error on this issue, Cities contend that the Commission did not comply with section 2001.141(b) of the APA because it failed to set out real findings of fact to support its determination. Section 2001.141(b) requires: "A decision that may become final ... must include findings of fact and conclusions of law, separately stated." Cities assert that Finding of Fact 122 fails to meet this requirement.

■ The requirement that an agency make findings of fact to support a decision grew out of several objectives: to restrain an agency from making a decision without full consideration of the evidence, to inform parties of the facts so that they may intelligently prepare and present an appeal, and to assist the courts in properly exercising their reviewing function. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 451–52 (Tex.1984). An agency's findings of fact fall into two categories: findings of basic fact and findings of ultimate fact. A finding of ultimate fact is reached by inference from basic facts. *Wilson v. Metcalf,* 257 S.W.2d 855, 858 (Tex.Civ.App.—Amarillo 1953, writ ref'd n.r.e.); *see generally* John Powers, *Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases,* 16 Tex. Tech.L.Rev. 475, 476–79 (1985). A finding that a rate is reasonable is one example of a finding of ultimate fact. *See* Bob E. Shannon & James B. Ewbank, II, *The Texas Administrative Procedure and Texas Register Act*

*Since 1976—Selected Problems,* 33 Baylor L.Rev. 393, 411–12 (1981). In *Charter Medical,* the Texas Supreme Court concluded that a finding of ultimate fact must be supported by an accompanying statement of underlying facts "only when the ultimate fact finding embodies a mandatory finding set forth in the relevant enabling act." *Id.* at 451. An agency's finding of ultimate fact that does not embody a mandatory fact finding set forth in the relevant enabling act need not be supported by findings of basic fact, regardless of how conclusory the finding of ultimate fact may be.

Because Finding of Fact 122 was not set forth in statutory language, the Commission did not have to make other findings of underlying fact to support it. *See id.* Finding of Fact 122 reflects the Commission's decision to reject Cities' proposed adjustment to the previously approved non-Oklaunion depreciation rates after a review of the evidence. We therefore uphold the district court's affirmance of the Commission's determination on non-Oklaunion depreciation rates.

## THE SURCHARGE ISSUE

WTU's initial rate filing at the Commission and with the municipalities sought uniform, system-wide rates. Pursuant to section 24 of PURA, Cities and the cities of San Angelo and Sonora ("SAS") separately intervened in the Commission's proceedings involving WTU. *See* PURA § 24 (West Supp.1995). Section 24 of PURA authorizes a municipality to participate in Commission proceedings involving utilities serving within its corporate limits and requires the public utility to reimburse the municipality for its reasonable rate case expenses. The amount of the rate case expenses the utility must reimburse the municipality is usually added to the utility's own expenses and becomes part of the utility's revenue requirement to be recovered

---

**19.** Cities cite *Railroad Commission v. Alamo Express, Inc.,* 158 Tex. 68, 308 S.W.2d 843 (1958), for the proposition that the Commission was wrong to rely on its decision in a previous docket concerning WTU's depreciation rates. *Alamo Express,* however, involved a different situation than the present case. The court in that case held that the Railroad Commission's order, which granted certain motor carriers certificates of convenience and necessity, was void on the grounds that the Railroad Commission adopted findings of fact from a previous case without making any findings in the case before it. *Id.* at 846. In the present case, the Commission did not rely on findings of fact from a previous case to support a new order concerning depreciation rates. The Commission merely declined to adjust depreciation rates established in a prior final order.

through rates. At a prehearing conference, the two sets of cities requested that they not be grouped together in the proceedings because of an alleged difference in their rate design positions; WTU did not object to the request, and the two groups of cities remained separated.

On August 14, 1987, WTU filed a motion requesting the examiner to group the two sets of cities for hearing purposes in order to reduce time and rate case expenses. WTU's motion also sought implementation of a surcharge to residents of the participating municipalities. WTU claimed that the similarity of the pleadings, discovery questions, and testimonies filed by Cities and SAS revealed that rate design differences made up only a minor part of the two sets of cities' cases. When the cases were not consolidated, WTU requested that the amount of rate case expenses incurred by Cities and SAS be specifically recognized by allowing the recovery of those expenses through a surcharge to ratepayers inside the respective cities. The Examiners' Report issued on November 7, 1987 recommended rejection of the surcharge in Finding of Fact 158. The Commission order, which adopted the Examiners' Report in part, rejected the examiners' Finding of Fact 158. The Commission filed a clarification order on January 12, 1988 to amend Finding of Fact 158 to read:

> WTU's request for authority to surcharge the rate case expenses incurred by the municipal intervenors to customers in those cities should be approved, because *WTU's other customers have no opportunity to participate in the intervenor cities' decision-making* concerning participation in this docket, and because such a *surcharge is an effective way to ensure that such expenses are reasonable and not duplicative.* Inasmuch as, under PURA § 24, municipal intervenors' rate case expenses must be paid by WTU's ratepayers, it is *more equitable that the burden of such expenses be borne by the particular ratepayers who reside within the intervenor cities,* than by WTU's ratepayers in general. This is particularly true since the *interests of individual cities do not always coincide* and WTU's ratepayers must also pay for the costs incurred by other partici-

pants in this case, either as taxpayers or as intervenors themselves. . . .

(Emphasis added.)

 In this appeal, Cities claim that the district court erred in affirming the Commission's order establishing a surcharge because the Commission's decision disregarded provisions of PURA and the APA. Cities conceded in their brief and at oral argument that the Commission has the authority to impose a surcharge, and they recognized the principle articulated in *Texas Alarm & Signal Association v. Public Utility Commission,* 603 S.W.2d 766 (Tex.1980), that the Commission has discretion in determining rate design. *Id.* at 772. The thrust of Cities' complaint is that there was no evidence to support the requested surcharge in this case. In three points of error, Cities complain that (1) the Commission decision is not supported by record evidence in violation of section 2001.174(2)(E) of the APA; (2) Finding of Fact 158 is not based on record evidence or matters officially noticed in violation of section 2001.141(c) of the APA; and (3) the Commission made its decision based on arbitrary and capricious procedure in violation of APA sections 2001.174(2)(C) and (F). The Commission and WTU respond that the surcharge finding is really a conclusion of law justified by the Commission's policy decision to prevent duplicative expenses in rate case proceedings and to promote equity by ensuring that cities which do not benefit by the expenses incurred by intervening municipalities do not have to bear the burden of the expenses.

 We determine that the Commission's policy decision to impose the surcharge on the two sets of cities that generated the expenses falls within its discretion to pass through ratemaking costs to the consumer. The Commission's decision to allocate utility expenses among various classes of consumers is within the Commission's discretion. *See Texas Alarm & Signal,* 603 S.W.2d at 772. Courts have recognized that rate design is a complex problem and may be based on many factors. *See Public Util. Comm'n v. AT & T Communications,* 777 S.W.2d 363, 366 (Tex. 1989). The Texas Supreme Court, as well as

this Court, has acknowledged the pass through of ratemaking costs to the consumer by a surcharge as a widely recognized ratemaking practice. In *City of Corpus Christi v. Public Utility Commission*, 572 S.W.2d 290 (Tex.1978), the court upheld a Commission decision to allow the utility to recover rate case expenses incurred by municipalities through a surcharge imposed on ratepayers in each city. *Id.* at 296. In a subsequent case, this Court upheld a surcharge on ratepayers within municipal limits against objections of discrimination and lack of substantial evidence. *City of Houston v. Public Util. Comm'n,* 656 S.W.2d 107, 110 (Tex.App.—Austin 1983, writ ref'd n.r.e.). The city of Houston argued that discrimination between ratepayers drawn along the lines of municipal limits is not favored. *Id.* at 109. The city further claimed that the Commission improperly based its order on the benefits received by the ratepayers in the municipality while ignoring the indirect benefits received by other ratepayers outside the municipality. *Id.* at 110. The Court upheld the surcharge, determining that the surcharge in *City of Corpus Christi*

> is highly analogous to the surcharge authorized by the Commission in the present case, in that both represent costs imposed upon the utility by one municipality alone, and both represent costs to the ratepayers of that municipality alone, although ratepayers outside the municipality may indirectly benefit from the use of that municipality's facilities on the one hand, and rate proceeding expenditures, on the other.

*City of Houston,* 656 S.W.2d at 111.

Cities characterize the surcharge as a punitive measure by the Commission to punish the two sets of cities for not presenting a consolidated case and thus argue that the surcharge interferes with Cities' ability to exercise their rights to intervene under section 24 of PURA. However, this Court refuses to enter into the realm of speculation.

Accordingly, we do not attempt to decipher the motivation of the Commissioners: "The thought processes or motivations of an administrator are irrelevant in the judicial determination whether the agency order is reasonably sustained by appropriate findings and conclusions that have support in the evidence." *Pedernales Elec. Coop., Inc. v. Public Util. Comm'n,* 809 S.W.2d 332, 342 (Tex.App.—Austin 1991, no writ) (quoting *City of Frisco v. Water Rights Comm'n,* 579 S.W.2d 66, 72 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.)).

██ Because Finding of Fact 158 rests in large part on a policy determination, it is unnecessary to determine whether the record contains evidence to support the Commission's decision; the Commission's policy judgment fits well within the rule articulated in *Texas Association of Long Distance Telephone Companies (Texaltel) v. Public Utility Commission,* 798 S.W.2d 875 (Tex.App.—Austin 1990, writ denied). In *Texaltel,* this Court held that when an agency decision involves the balancing of competing interests—such as recovery of revenues proportionate to the costs of providing services versus the impact that large rate increases can have on utility customers—and an evaluation of the equities of the situation, the agency is making a fundamental policy choice. The agency can choose to implement such a policy through the APA's formal rulemaking procedures or, under certain circumstances, on an ad hoc basis. *Id.* at 886. "An ad hoc 'rule' is an agency statement that interprets, implements, or prescribes agency law or policy." *Id.* When the agency promulgates an ad hoc "rule," the appropriate standard of review for an appellate court is not whether the agency's policy choice is supported by substantial evidence, but whether the choice was arbitrary and capricious. *Id.* at 887.[20]

██ In the present case, the Commission made an ad hoc policy decision that an equi-

---

20. We thus determined that it was immaterial whether the record contained direct evidence to support the Commission's policy choice. However, we did go on to discuss whether the Commission finding had evidentiary support in the record, "assuming *arguendo*" that the finding has to have evidentiary support. We cited *Railroad Commission v. Lone Star Gas Co.,* 611 S.W.2d 908, 911 (Tex.Civ.App.—Austin 1981, writ ref'd n.r.e.), for the proposition that "[a] valid exercise of agency expertise, like other agency action, must find ultimate support upon evidence taken at the hearing or upon facts judicially noticed."

table result would be achieved by imposing a surcharge upon the intervenor municipalities that generated the costs. Two objectives motivated the Commissioners' allocation decision: the desire to discourage duplicative efforts and to prevent nonparticipants from having to pay for a municipality's intervention in Commission proceedings. Our task is to determine whether the agency's policy choice was arbitrary and capricious. Under the arbitrary and capricious standard of review, we must determine whether a rational basis exists for the agency decision. *Bullock v. Hewlett–Packard Co.*, 628 S.W.2d 754, 757 (Tex.1982) ("A rule is arbitrary and capricious when it lacks a legitimate reason to support it."). The Commission's stated policies—to promote equity and deter duplicative efforts—provide such a rational basis.

Even assuming *arguendo* that the Commission's finding must have evidentiary support in the record, we conclude that the record contains all the information necessary to support the Commission's decision to impose a surcharge on the intervening municipalities. The record includes the identity of both groups of intervenors; the nature of the municipalities' participation in the proceeding through pleadings, discovery documents, and transcripts; the extent to which the two groups duplicated efforts, as evidenced by the above; and the amount of rate case expenses incurred by Cities. WTU's cost study, which demonstrated the method of allocation of WTU rate case expenses to customer classes, was in evidence to support the method of allocation for Cities' expenses. Based on this record evidence, it was reasonable for the Commission to conclude that ratepayers within the respective municipalities should be responsible for paying rate case expenses incurred by their governing bodies. Reading Finding of Fact 104, which found Cities' rate case expenses reasonable, in conjunction with Finding of Fact 158, which permitted the surcharge, we conclude that the expenses were reasonable, and that it was the surcharge that helped to make them so.

We reject Cities' claim that they were denied a fair hearing on the surcharge issue in violation of section 2001.141(c) of the APA.[21] Section 2001.141(c), which was designed to protect the parties' fundamental due process rights, does not mandate that parties be given an unlimited right to cross-examination and multiple hearings. WTU asked to surcharge Cities' ratepayers in a pleading filed before the hearing on the merits, and Cities filed a response to WTU's motion. During the hearing on the merits, the examiner denied WTU's motion to consolidate and postponed the ruling on the surcharge issue. Cities could have asked to present evidence against the surcharge during the hearing but did not. All parties had the opportunity to file exceptions to the Examiners' Report, which included Finding of Fact 158, and replies to those exceptions. Thus, the surcharge issue was presented, discussed, and ruled on with all necessary due process. Cities presented their position on the issue, and the Commission considered the conflicting arguments and positions in reaching its decision. *Cf. Texas Water Comm'n v. Boyt Realty Co.*, No. 3–91–279–CV, slip op. at 14, — S.W.2d —, —, 1993 WL 219704 (Tex.App.—Austin June 23, 1993, rehearing subject to bankruptcy proceedings) (determining that appellant had ample opportunity to present evidence because "[t]he expenses in issue had been disputed in the hearing before the examiner and substantial time had passed before the open hearing with the Commission was held"). The Commission procedure in granting the requested surcharge did not violate section 2001.141(c) of the APA. Accordingly, we overrule Cities' points of error on this issue and affirm the trial-court judgment.

## CONCLUSION

We reverse those portions of the district court's judgment relating to deferred Oklaunion charges and render judgment reversing the Commission order concerning those deferred charges. We remand the cause to the Commission for it to reexamine the issue of deferred costs in light of its forthcoming decision in Docket 7289. We affirm all other

21. Section 2001.141(c) requires that "[f]indings of fact may be based only on the evidence and on

matters that are officially noticed." APA § 2001.141(c).

aspects of the district-court judgment in which the court upheld the non-Oklaunion depreciation rates and the surcharge approved by the Commission.