TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00845-CV






Southwestern Bell Telephone Company, Appellant



v.



Public Utility Commission of Texas; Cities of Austin, Dallas, Fort Worth and Hereford;


Office of Public Utility Counsel; and General Services Commission, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT


NO. 99-03584, HONORABLE F. SCOTT McCOWN, JUDGE PRESIDING 







 With revisions to the Public Utility Regulatory Act (PURA) in 1995, the legislature
created a statutory alternative to traditional rate-of-return ratemaking. (1) Appellant Southwestern
Bell Telephone Company (SWBT) elected to be governed under this new scheme, which provides
instead for "incentive regulation." Pursuant to this scheme, SWBT applied to appellee, the Public
Utility Commission (the Commission), for a rate-group reclassification. (2) The Commission denied
the request in most respects, and SWBT sought judicial review in the district court. (3) The district
court reversed and remanded in part, but affirmed the central portions of the Commission's order
and effectively denied most of the relief sought by SWBT. The Commission did not appeal the
portions of its order that were reversed by the district court. On appeal, SWBT raises four issues
challenging portions of the district court judgment affirming the Commission's order. We will
affirm in part and reverse and remand in part.


FACTUAL AND PROCEDURAL BACKGROUND

 This case involves a skirmish in the shift toward deregulation of telecommunication
utilities. Historically, companies like SWBT have been regulated according to traditional rate-of-return principles, which involve a complicated and speculative process of regulating costs and
estimating a fair rate of return on investment. See PURA § 53.051 (West 1998).

 In a 1977 rate-making proceeding under the traditional rate-of-return scheme, the
Commission adopted a system of rate-group classifications for SWBT. Exchanges served by
SWBT were divided into ten rate groups classified according to the number of working telephone
lines in each exchange, and customers in each city were charged a tariff according to the rate
group in which their exchange was classified. Rates progressively increased from the smaller
groups to the larger, so customers in exchanges with fewer phone lines paid less than customers
in exchanges with more phone lines. The higher tariffs represented a value-of-service principle: 
callers in an exchange with a larger number of phone lines could reach more telephones without
paying long distance charges than could callers in a smaller exchange.

 Over the years, the Commission has, in the course of rate-making proceedings,
adjusted the number and boundaries of rate groups as needed to maintain exchanges' relative
classifications and to prevent exchanges with significantly different numbers of telephone lines
from ending up in the same rate group. (4) In so doing, the Commission used rate-group
reclassification as a rate-design tool to help control how SWBT recovered its revenue requirement
and to achieve equitable rates for all customers. Today, SWBT has eight rate groups instead of
ten. The number and boundaries of the rate groups applicable to SWBT have not been reclassified
since 1990.

 There is now a national trend toward utility deregulation and away from rate-of-return regulation. Accordingly, the legislature adopted what is now codified as PURA chapter
58, effective in September 1995, which allows instead for incentive regulation. The purpose of
this chapter is to "provide a framework for an orderly transition from the traditional regulation
of return on invested capital to a fully competitive telecommunications marketplace in which all
telecommunications providers compete on fair terms." PURA § 58.001(1) (West 1998). A
telephone company electing regulation under the incentive system agrees to cap its rates for four
years and fulfill other infrastructure commitments. See id. §§ 58.021(b), .054 (West Supp. 2000). 
In exchange, the company is able to garner more earnings if and when it increases its efficiency. 
A company regulated according to incentive regulation is not subject to a complaint, hearing, or
determination regarding the reasonableness of its rates or revenues. See id. § 58.025 (West
1998). SWBT made this election in September 1995.

 Chapter 58 includes three exceptions to the mandatory rate freeze: rate adjustments
are allowed for (1) changes in FCC separations, (5) (2) certain companies with fewer than five
million access lines in the state, (6) and (3) rate-group reclassification. (7) It is this last exception that
is at issue in this case. Specifically, PURA provides that when a company has elected incentive
regulation, "the commission, on request of the electing company, shall allow a rate group
reclassification that results from access line growth." Id. § 58.058. The Commission and SWBT
disagree over the meaning of that section and the role of rate groups under the new regulatory
scheme.

 In December 1997, SWBT requested reclassification of 52 exchanges into different
rate bands to reflect access-line growth since the last reclassification in 1990. The reclassification
of all 52 exchanges would have resulted in an annual revenue increase of approximately $40
million. Most of that increase is attributable to the requested reclassification of exchanges in
Austin (from Rate Group 5 to 6), Fort Worth (from Rate Group 6 to 7), and Dallas (from Rate
Group 7 to 8). When several parties intervened to oppose the application, the proceeding was
docketed as a contested case and referred to the State Office of Administrative Hearings for
hearings before an administrative law judge (ALJ).

 After proceedings before the ALJ, the Commission ultimately adopted most
provisions of the ALJ's proposed decision, and while some rate-group reclassifications were
allowed, the Commission's order denied SWBT most of the revenue increase it had sought
through reclassification. SWBT appealed to the district court. The district court reversed and
remanded in part, (8) but affirmed most of the Commission's order. SWBT has appealed, raising
four issues regarding the affirmed portions of the district court's judgment.

 First, the Commission adopted the portion of the ALJ's proposed decision holding
that "it would be appropriate to increase the upper level of Rate Group 5 and Rate Group 7 to
retain Austin and Dallas, respectively, in their current rate groups." By changing the boundaries,
the Commission expanded the number of lines in those rate groups so that exchanges in Austin
and Dallas no longer qualified for reclassification. SWBT complains that the Commission was
bound to grant rate-group reclassifications based on increased line growth pursuant to PURA
section 58.058 and that the Commission could not change the boundaries of the rate groups in
doing so. SWBT asserts that, by changing the boundaries in a way that thwarted the requested
reclassification of Austin and Dallas, the Commission improperly applied to the new incentive
regulation scheme a rate-design tool appropriate only to rate-of-return regulation.

 SWBT's second issue on appeal concerns the Commission's conclusion that SWBT
could not benefit from pre-September 1995 access-line growth when it sought rate-group
reclassification under the new incentive regulation scheme. In a stipulation reached in a prior
rate-making case, SWBT agreed to refrain from seeking reclassification of any exchange to a
higher rate group between 1991 and 1994. (9) SWBT then voluntarily extended the duration of the
stipulation until September 1995, when SWBT elected incentive regulation under chapter 58 of
PURA. Now that the term of the stipulation has expired, SWBT seeks to include line growth that
occurred during the voluntary rate freeze in its reclassification of exchanges into new rate groups. 
The Commission held that line growth that occurred during the term of the stipulation should not
be considered, and that section 58.058 was meant to apply only to line growth occurring after the
election of incentive regulation. (10) The Commission's decision on this issue eliminated 27 of the
52 exchanges for which SWBT sought reclassification, including the Fort Worth exchange.

 During the course of these administrative proceedings, SWBT sought but was
denied the opportunity to conduct discovery about proceedings surrounding another rate-group
application filed by the United Telephone Company of Texas, d/b/a Sprint. In its third issue on
appeal, SWBT asserts that Sprint is a similarly situated carrier subject to the same statutes, that
a different result was reached in that case, and that SWBT should have been allowed to discover
and introduce evidence of the disparate treatment received by the two companies.

 Finally, in its fourth issue, SWBT complains that there is no statutory basis for the
portion of the Commission's order requiring SWBT to pay Cities' attorney's fees. Alternatively,
if it is required to pay the attorney's fees, then SWBT argues that it should also be able to recoup
those fees in the rates it charges its customers.


DISCUSSION

Rate-Group Reclassification

 PURA provides an exception to the rate cap SWBT agreed to when it elected
incentive regulation, mandating that "Notwithstanding Subchapter B,[ (11)] the commission, on
request of the electing company, shall allow a rate group reclassification that results from access
line growth." PURA § 58.058 (emphasis added). Based on line growth that had occurred since
its exchanges were last reclassified in 1990, SWBT sought rate-group reclassifications pursuant
to that section. Rather than simply reclassifying exchanges using existing rate-group boundaries,
the Commission responded to SWBT's request by changing the boundaries of two of the rate
groups in order to keep the cities of Dallas and Austin in their existing respective rate groups. 
In its first issue on appeal, SWBT protests that the Commission is not authorized to change rate-group boundaries because the language of section 58.058 is mandatory ("shall allow rate group
reclassification") and so requires that the Commission reclassify exchanges once SWBT
establishes that the exchanges have experienced access-line growth.

 The Commission counters that rate groups have historically been used as a rate-design tool and are not intended as a means for giving SWBT an automatic rate increase. 
Therefore, the Commission claims that, consistent with past practice, it was free to reexamine and
adjust the boundaries of SWBT's rate groups to maintain cities in their current rate groups and
to prevent undue revenue increases as a result of reclassification. SWBT concedes that past rate-group reclassifications have involved modifying rate groups' upper and lower boundaries, but
complains that carrying that practice over into incentive regulation violates the plain language of
applicable sections within chapter 58. We agree with SWBT.

 By adopting chapter 58, the legislature signaled a sea change in how
telecommunications utilities that have elected incentive regulation are to be governed. Contrary
to prior practice, section 58.025 states that a company electing incentive regulation "is not, under
any circumstances, subject to a complaint, hearing, or determination regarding the reasonableness
of the company's: (1) rates; (2) overall revenues; (3) return on invested capital; or (4) net
income." PURA § 58.025 (West 1998). By changing rate-group boundaries to thwart SWBT's
requested reclassification, the Commission was conducting precisely this kind of "reasonableness"
inquiry.

 In the findings of fact in its order, the Commission candidly admitted that it
"adjusted the size of rate groups in order to avoid placing two exchanges with significantly
different numbers of [access lines] in the same group." Specifically, the boundaries were changed
to retain Austin and Dallas in their current rate groups because "[t]o put Austin in the same rate
group as exchanges with considerably more [access lines] would be a departure from the rate-design strategies used by the Commission in the past." This rationale necessarily involved an
inquiry into the reasonableness of SWBT's rates or revenues--i.e., the Commission refused to
move Austin and Dallas into higher rate groups because it determined that it would be
unreasonable to charge the same tariff to customers in cities with significantly different numbers
of access lines. Section 58.025 expressly prohibits such a determination of the reasonableness of
rates or revenues.

 In this context, to give the term "rate group reclassification" the same meaning it
had before incentive regulation was introduced would frustrate the intent of the legislature to free
an electing utility from traditional ratemaking. Our goal in interpreting statutes is to ascertain and
give effect to the legislature's intent. See Sorokolit v. Rhodes, 889 S.W.2d 239, 241 (Tex. 1994). 
We do so by looking first to the plain language the legislature used. See id. Under the plain
meaning rule, if a statute is clear and unambiguous we interpret it according to its common
everyday meaning. See Cail v. Service Motors, Inc., 660 S.W.2d 814, 815 (Tex. 1983); El Paso
Indep. Sch. Dist. v. Sharp, 923 S.W.2d 844, 846 (Tex. App.--Austin 1996, writ denied). By
stating that the Commission "shall allow a rate group reclassification," section 58.058 plainly
requires the Commission to reclassify exchanges into new rate groups when a utility has proven
access-line growth. We do not believe the mandatory language of the statute contemplates a
contemporaneous adjustment to the rate-group boundaries designed to prevent the very
reclassification called for by section 58.058. To allow the Commission to avoid the mandate in
section 58.058 in this way would undermine the legislative intent expressed in the statute's plain
language.

 The Commission argues that the mandatory language in section 58.058 is tempered
by other sections within the same chapter. For example, while section 58.058 states that the
Commission "shall allow a rate group reclassification," section 58.059 states that "an electing
company may request and the commission may authorize a rate adjustment under Section . . .
58.058." PURA § 58.059 (West 1998). The Commission argues that, by using the permissive
term "may," section 58.059 gives it the discretion to allow or disallow an adjustment requested
by a utility under section 58.058. We disagree.

 The Code Construction Act offers guidance on how to interpret the terms "may"
and "shall": "(1) 'May' creates discretionary authority or grants permission or a power. (2)
'Shall' imposes a duty." Tex. Gov't Code Ann. § 311.016 (West 1998) (emphasis added). The
Commission wants us to read section 58.059 as giving it the discretionary authority to change
rate- group boundaries when it considers a rate-group reclassification. But to interpret section
58.059 so broadly would, in effect, nullify the rate-group reclassification expressly mandated by
section 58.058; by the Commission's reading of section 58.059, it would have the discretion to
never allow a rate adjustment, even though section 58.058 was enacted specifically as a way for
utilities to increase their otherwise-frozen rates. Where possible, we are required to interpret
statutory language in a manner that harmonizes and gives effect to all relevant laws. See Dallas
Merchant's & Concessionaire's Ass'n v. City of Dallas, 852 S.W.2d 489, 495 (Tex. 1993); see
also Dial v. State, 658 S.W.2d 823, 826 (Tex. App.--Austin 1983, no pet.) (statutory sections that
"are not positively repugnant will each be construed so as to give effect to both, if possible"). 
Only by relying on the Code Construction Act's alternate definition and interpreting "may" as it
is used in section 58.059 to grant permission or power to the Commission to authorize a rate-group reclassification requested pursuant to section 58.058 do we harmonize the two sections.

 We are similarly unpersuaded by the Commission's reliance on the language of
section 58.055 that states, "(a) An electing company may increase a rate for a basic network
service during [the rate freeze] only: (1) with commission approval that the proposed change is
included in Section . . . 58.058; and (2) as provided by Section[] . . . 58.058." PURA § 58.055
(West Supp. 2000). The Commission urges that this section gives it the discretion--but does not
require it--to allow a rate adjustment to occur as part of a rate-group reclassification. As explained
above, however, such an interpretation would render the mandatory language of section 58.058
meaningless. Because the legislature specifically allowed rate-group reclassification as an
exception to a utility's agreed rate freeze and used mandatory language in directing the
Commission to allow such reclassification, we believe that it intended rate-group reclassification
requested pursuant to section 58.058 to be a largely mechanical process.

 Under rate-of-return regulation, rate-group reclassification was used as a rate-design tool to keep access-line growth essentially revenue neutral. The mandatory language of
section 58.058--combined with section 58.025's promise that SWBT "is not, under any
circumstances, subject to a complaint, hearing, or determination regarding the reasonableness"
of its rates or revenues--convinces us that rate-group reclassification cannot continue to be so used
for utilities that opt for incentive regulation. See PURA § 58.025. Once the utility establishes
that it has experienced sufficient line growth, "the commission shall allow a rate group
reclassification that results from access line growth." Id. § 58.058. However reasonable the
Commission's adjustments to the rate group boundaries might have been if conducted in a
traditional rate-of-return ratemaking proceeding, they are not appropriate where, as here, SWBT
is plainly not subject to an inquiry into the reasonableness of its rates. SWBT's first issue is
sustained.


Exclusion of Line Growth During Stipulation Period

 SWBT next complains that when reclassifying exchanges into new rate groups, the
Commission should not be able to exclude line growth that occurred prior to September 1, 1995. 
In its order on this issue the Commission explained:


Prior to its election, SWBT was subject to the terms of its last rate case, Docket
No. 8585, a non-unanimous stipulation to which SWBT was a party. The bargain
struck and approved by the Commission in Docket No. 8585 afforded SWBT
pricing flexibility for services facing competition while also imposing a rate cap
on basic local exchange services. The final order in Docket No. 8585 explicitly
prohibited SWBT from reclassifying any exchange to a higher rate group during
the term of the stipulation: 1991 through 1994. SWBT then voluntarily extended
the term of the stipulation until September 1995, at which time it elected incentive
regulation under PURA.



 No one disputes that SWBT complied with the terms of the stipulation and did not
seek rate-group reclassification during the term of the agreement. Once the stipulation expired,
however, SWBT sought to include line growth that occurred during that period through a "rate
group reclassification that results from access line growth." PURA § 58.058. Although the ALJ
sided with SWBT, the Commission refused to allow consideration of that line growth, holding
instead that section 58.058 was meant to apply only to line growth occurring after an electing
company chose to be regulated under incentive regulation. The district court affirmed the
Commission's holding.

 Though they reached opposite conclusions, the ALJ and the Commission both
agreed that section 58.058 is not clear on its face. The statute merely provides for rate-group
reclassification that results from access-line growth; it does not specify the date from which the
line growth should be measured. An agency's construction of a statute that it is charged with 
enforcing is entitled to great weight, so long as the interpretation is reasonable and does not
contradict the plain language of the statute. See Texas Citrus Exch. v. Sharp, 955 S.W.2d 164,
169 (Tex. App.--Austin 1997, no pet.); Texas Ass'n of Long Distance Tel. Cos. (TEXALTEL) v.
Public Util. Comm'n, 798 S.W.2d 875, 884 (Tex. App.--Austin 1990, writ denied). SWBT
asserts, and we agree, that the Commission's interpretation of section 59.058 is not reasonable
and so is not entitled to deference.

 Section 58.058 states that "the commission . . . shall allow a rate group
reclassification that results from access line growth." What the Commission essentially seeks to
do here is add a caveat to the plain language of this statute, so the statute requires it to allow
"reclassification that results from access line growth except when we choose not to count such
growth." A court may not judicially amend a statute to add words that are not implicitly
contained in the language of the statute. See Jones v. Liberty Mut. Ins. Co., 745 S.W.2d 901, 902
(Tex. 1988). "Only when it is necessary to give effect to the clear legislative intent can we insert
additional words into a statutory provision." Id. (quoting Hunter v. Fort Worth Capital
Corp., 620 S.W.2d 547, 552 (Tex. 1981)). There is no indication that the legislature intended
for the Commission to create exceptions to section 58.058 that would ignore significant line
growth, and the Commission's assertion that every access line in some exchanges will be counted
while some lines in other exchanges may be ignored stretches logic.

 The Commission's order concedes that "[t]here is no question that for exchanges
that experienced growth in access lines after September 1, 1995, § 58.058 allows rate group
reclassification," but goes on to say that allowing SWBT to count access-line growth prior to
September 1, 1995 would "create[] a loophole for SWBT's earlier bargain under Docket No.
8585." The Commission held that "the earlier bargain creates a reasonable basis for
distinguishing between pre-1995 access line growth and post-1995 access line growth for purposes
of the relief sought in this case."

 The district court focused more on retroactivity concerns, apparently reasoning that
because statutes are presumed to apply only prospectively, in enacting section 58.058 the
legislature could only have contemplated including prospective line growth. Utility rates, like any
other legislation, can generally have only prospective application and cannot be used to recoup
losses or gains incurred under rates set in prior proceedings. See TEXALTEL, 798 S.W.2d at 882. 
The district court judgment held that allowing SWBT to count line growth during the stipulation
period and before it elected incentive regulation would effectively permit the utility to "reach back
and take growth in access lines to increase the rates." Retroactivity concerns are misplaced here,
however. A statute is not retroactive merely because it draws upon antecedent facts for its
operation. See Lewis v. Fidelity & Deposit Co., 292 U.S. 559, 571 (1933); American Home
Assurance v. Texas Dep't of Ins., 907 S.W.2d 90, 94 (Tex. App.--Austin 1995, writ denied). 
Here, SWBT is seeking to apply the new statute only prospectively by counting its current number
of access lines and classifying its exchanges into rate groups accordingly. This does not violate
the general prohibition on giving a statute retroactive effect.

 Perhaps the most compelling argument against the agency's interpretation of section
58.058 emerges by examining the absurd results reached under that interpretation. In determining
the meaning of a statute, a court must consider the entire act, its nature and object, and the
consequences that would follow from each construction. See Sharp v. House of Lloyd, Inc., 815
S.W.2d 245, 249 (Tex. 1991) (citing Sayre v. Mullins, 681 S.W.2d 25, 27 (Tex. 1984)). 
Interpretations that would produce absurd results are to be avoided. See id. (citing McKinney v.
Blankenship, 282 S.W.2d 691, 698 (Tex. 1955)).

 By the Commission's own description, rate-group reclassification is allowed
because "a customer in a larger exchange is able to call or receive calls from a greater number
of lines at no cost than can a customer in a smaller exchange, [so] the larger exchange has more
value and should be priced higher." (12) Yet under the Commission's order, customers in an
exchange that experienced line growth from 1991-1995 would pay less than customers in an
exchange that has experienced significant growth since 1995 even if the two exchanges now have
precisely the same number of access lines and would otherwise be classified in the same rate band. 
This is true merely because the Commission has made the decision to forever exclude access lines
that were added during the stipulation term, a decision that bears no relationship to the purpose
of using rate bands to reflect customers' cost of service. Like the ALJ, we "can find no
reasonable basis, no ground of distinction, for treating comparably-sized exchanges differently." 
We sustain SWBT's second issue.


Denial of Discovery Request

 In its third point of error, SWBT complains that the Commission erroneously
deprived it of the opportunity to discover and introduce evidence regarding a rate-group
reclassification proceeding involving Sprint. Sprint has also elected incentive regulation, and
according to SWBT, Sprint filed its own application for rate-group reclassification just days before
SWBT filed its application. In Sprint's case, however, the Commission approved the
reclassification without reexamining the boundaries of Sprint's rate groups. Sprint had also
previously agreed under a stipulation to cap local exchange rates, and the approved reclassification
allowed Sprint to include line growth that occurred during the period of the stipulation. Because
both companies were subject to the same statutory scheme of incentive regulation and both
requested a rate adjustment under section 58.058, and because both companies had previously
been subject to rate-freeze stipulations, SWBT asserts that the Commission subjected the two
phone companies to disparate treatment. SWBT demanded the opportunity to discover and
introduce evidence of the purportedly inconsistent treatment and claims that the Commission acted
arbitrarily and capriciously in denying the request. It claims that the Equal Protection clauses of
the United States and Texas constitutions are violated by the Commission's denial of SWBT's
discovery request.

 Even assuming that SWBT is correct in its assertions that it and Sprint are similarly
situated in most ways material to this case, we do not believe that the Commission erred in
denying SWBT's request. In contested case hearings, the Commission generally follows the
Texas Rules of Evidence as they apply in non-jury civil cases. See Tex. Gov't Code Ann. §
2001.081 (West 2000); 16 Tex. Admin. Code § 22.141 (1999). It follows, then, that agency
decisions on matters of discovery, like similar trial court rulings, will be disturbed only to remedy
an abuse of discretion. See Markham v. Diversified Land & Exploration Co., 973 S.W.2d 437,
441 (Tex. App.--Austin 1998, pet. denied). An agency decision will be reversed only if substantial
rights of the appellant are prejudiced by the agency's abuse of discretion. See Tex. Gov't Code
Ann. § 2001.174(2)(F).

 The record reflects that discovery was denied primarily because Sprint's case was
disposed of administratively. Commission regulations allow some tariff filings to be disposed of
without going through the formal process of docketing them as contested case proceedings. 
See 16 Tex. Admin. Code § 22.33 (1999). Qualified proceedings may be approved by an ALJ
without a hearing or action by the Commission. See id. § 22.32 (1999). (13) Because the Sprint case
was disposed of according to these provisions, the ALJ held that "it is not precedent for this case,
that these questions were not addressed, that the Commission didn't even issue that order. . . . 
And so it seems to me that the Commission never reviewed this. So I don't think the Commission
is on record on this question." The ALJ went on to explain that the Sprint case "was a settled
case, and historically settled cases are . . . not generally used as precedent for future cases." We
find adequate the ALJ's explanation of why she denied SWBT's discovery request and find no
abuse of discretion in her decision. Nor do we find any fundamental violation of SWBT's
constitutional rights in the denial of this discovery request. SWBT's third issue on appeal is
overruled.


Attorney's Fees

 In its final issue on appeal, SWBT complains of the portion of the Commission's
order requiring it to pay Cities' attorney's fees. In allowing municipal participation in ratemaking
proceedings, PURA provides that:


(a) The governing body of a municipality participating in a ratemaking proceeding
may engage rate consultants, accountants, auditors, attorneys, and engineers
to:


 (1) conduct investigations, present evidence, and advise and represent the
governing body; and


 (2) assist the governing body with litigation before the commission or a
court.


(b) The public utility in the ratemaking proceeding shall reimburse the governing
body of the municipality for the reasonable cost of the services of a person
engaged under Subsection (a) to the extent the commission determines is
reasonable.



Id. § 51.006 (West 1998) (emphasis added). Thus, SWBT is required to reimburse Cities for their
attorney's fees incurred if these proceedings are deemed "ratemaking proceedings" and if the
Commission finds that the costs are reasonable. In this case, the parties reached an agreement and
SWBT has stipulated that the amount of fees requested by Cities was reasonable. However,
SWBT argues that, because it has elected incentive regulation, by definition it is no longer subject
to ratemaking proceedings and so the attorney's fee provision in section 51.006 cannot apply to
the present dispute.

 In the "definitions" section of PURA, which is applicable to all utilities,
"ratemaking proceeding" is defined as "a proceeding in which a rate is changed." PURA §
11.003(17) (West Supp. 2000). The definition of "rate" includes "any compensation, tariff,
charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed,
charged, or collected by a public utility for a service. . . ." Id. § 11.003(16). The present case
involves a requested change to a tariff that may be charged to certain customers on the basis of
their classification into different rate groups. This is plainly a proceeding in which a rate--a tariff
or classification--will be changed. SWBT's claim that these proceedings are not ratemaking
proceedings is contradicted by the plain language of PURA. Thus, the mandatory language of
PURA section 51.006 applies, and SWBT must reimburse Cities for their attorney's fees as
ordered by the Commission.

 SWBT next argues that, if it is required to pay Cities' attorney's fees, it should be
allowed to raise its rates to recoup that expense. Under the previous regime of rate-of-return
regulation, attorney's fees paid to municipalities in ratemaking proceedings were added to the
utility's own expenses and became part of the utility's revenue requirement to be recovered
through rates. See West Tex. Utils. Co. v. Office of Pub. Util. Counsel, 896 S.W.2d 261, 270-71
(Tex. App.--Austin 1995, no writ). Had it not elected incentive regulation, SWBT would clearly
be allowed to recoup this expense in rates. However, no similar allowance is made under
incentive regulation, and when it elected to be governed under this scheme SWBT agreed to freeze
its rates subject to three narrow statutory exceptions. (14) An increase in expenses due to an order
to pay attorney's fees incurred by municipalities in ratemaking proceedings is not one of the
exceptions to the rate freeze created by the legislature; we therefore find no error in the district
court's conclusion that PURA contains "no provision that entitles [SWBT] to recover the
attorneys' fees awarded to Cities in this case." While we are sympathetic to SWBT's complaint
that this creates something of a statutory "catch 22," it is the province of the legislature and not
this Court to address any ensuing inequity. See Southern Pac. Transp. Co. v. Railroad Comm'n,
592 S.W.2d 74, 77 (Tex. Civ. App.--Austin 1979, writ ref'd n.r.e.) ("Deficiencies in the laws
regulating an industry '. . . will not justify a court's excursion beyond its proper sphere in order
to plug a hole or cure a supposed defect in the legislative scheme of things.'") (quoting State v.
Reyna, 333 S.W.2d 832, 838 (Tex. 1960)). SWBT's fourth issue on appeal is overruled.


CONCLUSION

 We hold that the district court erred in affirming the portions of the Commission's
order that (1) allowed the Commission to change rate-group boundaries when it considered the
rate-group reclassification requested by SWBT and (2) allowed the Commission to exclude from
consideration access-line growth occurring during the period governed by a now-expired
stipulation to a rate freeze. Those parts of the district court's judgment are reversed, and those
causes of action are remanded to the district court with instructions to remand to the agency for
further proceedings. We also hold that the district court did not err in affirming the portions of
the Commission's order (3) denying SWBT's discovery request regarding the Sprint proceedings
and (4) ordering SWBT to reimburse Cities for their attorney's fees without allowing a
corresponding rate increase. Those portions of the district court's judgment are affirmed.



 
 

 J. Woodfin Jones, Justice

Before Justices Jones, Yeakel and Patterson

Affirmed in Part; Reversed and Remanded in Part

Filed: August 10, 2000

Publish

1. See Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 49, 1995 Tex. Gen. Laws 2017,
2045 (since recodified at Tex. Util. Code Ann. ch. 58).
2. See PURA, Tex. Util. Code Ann. § 58.058 (West 1998). For the sake of convenience,
citations to PURA will be abbreviated as "PURA § ____."
3. See id. § 15.001 (West 1998).
4. The proposed decision by the administrative law judge found that in the past, "the
Commission raised the rate group upper limit when the failure to do so would put the exchange
in question in a rate group with an exchange that had between 100,000 and 300,000 more [access
lines]." In a previous docket number, for example, the upper boundary of Rate Group 5 was
raised to prevent the Austin exchange from being reclassified into Rate Group 6, which contains
the Fort Worth and San Antonio exchanges.
5. See PURA § 58.056 (West 1998).
6. See id. § 58.057 (West 1998).
7. See id. § 58.058 (West 1998).
8. The district court reversed the Commission's order to the extent that it excluded access-line
growth that the Commission found resulted from marketing efforts by SWBT, and remanded for
a new hearing to take into account all access-line growth that was erroneously excluded.
9. The Commission's order suggests that the agreement not to reclassify exchanges "afford[ed]
SWBT pricing flexibility for services facing competition while also imposing a rate cap on basic
local exchange services."
10. This portion of the Commission's order is contrary to the recommendation of the ALJ.
11. Subchapter B of chapter 58 governs the election of incentive regulation. See PURA
§§ 58.021-.028 (West 1998 & Supp. 2000). Subchapter C, in which section 58.058 is found,
governs the basic network services provided under the incentive regulation scheme. See id.
§§ 58.051-.063 (West 1998 & Supp. 2000).
12. The quoted language is from the ALJ's proposed decision and was adopted by the
Commission in its final order.
13. If the Commission receives a request to intervene in the tariff filing, then administrative
disposition is no longer permitted and the proceeding must be docketed. See Tex. Admin. Code
§ 22.33(b)(6) (1999). This is what happened in SWBT's case.
14. As already noted, rate adjustments are allowed only for some changes in FCC separations, (15)
15. See PURA § 58.056 (West 1998).
 (16)
16. See id. § 58.057 (West 1998). -
 §§ 


that the district court erred in affirming the portions of the Commission's
order that (1) allowed the Commission to change rate-group boundaries when it considered the
rate-group reclassification requested by SWBT and (2) allowed the Commission to exclude from
consideration access-line growth occurring during the period governed by a now-expired
stipulation to a rate freeze. Those parts of the district court's judgment are reversed, and those
causes of action are remanded to the district court with instructions to remand to the agency for
further proceedings. We also hold that the district court did not err in affirming the portions of
the Commission's order (3) denying SWBT's discovery request regarding the Sprint proceedings
and (4) ordering SWBT to reimburse Cities for their attorney's fees without allowing a
corresponding rate increase. Those portions of the district court's judgment are affirmed.



 
 

 J. Woodfin Jones, Justice

Before Justices Jones, Yeakel and Patterson

Affirmed in Part; Reversed and Remanded in Part

Filed: August 10, 2000

Publish

1. S