# Supreme Court of Texas

---

No. 23-0282

---

Save Our Springs Alliance, Inc.,

*Petitioner*,

v.

Texas Commission on Environmental Quality and
The City of Dripping Springs,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the Eighth District of Texas

---

**Argued October 1, 2024**

JUSTICE DEVINE delivered the opinion of the Court.

Save Our Springs Alliance, Inc. (SOS) challenges a final order of the Texas Commission on Environmental Quality (TCEQ) granting the City of Dripping Springs a permit to discharge treated wastewater into Onion Creek. Although myriad concerns have either been resolved or abandoned, the parties remain at odds over the proper construction and application of TCEQ's "antidegradation" rules and implementation

procedures.[1] The central conflict concerns TCEQ's practice of assessing "degradation" of water quality by evaluating impacts on the water body as a whole rather than affording decisive weight to numeric changes in individual water-quality parameters.

By TCEQ rule, "degradation" means "a lowering of water quality by more than a de minimis extent."[2] When deciding whether a proposed discharge will result in degradation, TCEQ consults multiple water-quality parameters to determine whether the discharge will cause an overall "lowering of water quality." Under this approach, numeric changes to one or more parameters may or may not equate to degradation. SOS reads the antidegradation rules as commanding a strict "parameter-by-parameter" approach, under which a cognizable change to even a single water-quality parameter is fatal to permit approval. In SOS's view, TCEQ was not authorized to issue the discharge permit because predictive modeling shows dissolved oxygen levels in Onion Creek will reduce from at least 6.44 mg/L to 5.0 mg/L, which is more than a de minimis change in that parameter.

---

[1] *See* 30 Tex. Admin. Code §§ 307.3(67) (defining standards implementation procedures), .5 (antidegradation policy and implementation procedures); Water Quality Division, *Procedures to Implement the Texas Surface Water Quality Standards* (RG-194) (June 2010) (the "2010 IPs"), https://www.tceq.texas.gov/downloads/permitting/water-quality-standards-im plementation/june-2010-ip.pdf; *see also* TEX. WATER CODE § 26.023 ("The commission by rule shall set water quality standards for the water in the state . . . [and] has the sole and exclusive authority to set water quality standards for all water in the state.").

[2] 30 Tex. Admin. Code § 307.5(b)(2).

2

The court of appeals upheld the permit's issuance,[3] and we affirm its judgment. TCEQ's practice of assessing a water body's overall quality conforms to the regulatory requirements as they are written. We are also unpersuaded by SOS's additional argument that TCEQ's final order is invalid for failure to include a "statement of the underlying facts" supporting TCEQ's ultimate fact findings.[4]

## I.

### A. The Disputed Discharge Permit

The City of Dripping Springs is rapidly outgrowing its current land-application wastewater permit, under which it may use treated water only to irrigate designated irrigation fields. To accommodate an expanding populace and plan for future needs, the City filed an application with TCEQ in 2015 for a permit to discharge up to 995,000 gallons per day of treated wastewater into two nearby waterways.[5] Initial discharges would be made into Walnut Springs and then travel approximately .43 miles to Onion Creek. This appeal focuses only on Onion Creek.

---

[3] 668 S.W.3d 710, 716 (Tex. App.—El Paso 2022).

[4] *See* TEX. GOV'T CODE § 2001.141(b), (d) (distinguishing between findings of fact and a statement of underlying facts).

[5] *See* TEX. WATER CODE § 26.027(a), (b) (authorizing TCEQ to issue permits to discharge waste or pollutants into or adjacent to state water and specifying minimum application requirements); 30 Tex. Admin. Code §§ 305.42, .45 .48 (requiring an application for a wastewater discharge permit). TCEQ's exercise of the state-law permitting authority granted by section 26.027 of the Water Code is part of a multi-layered federal–state regulatory regime, the details of which are not important here. *See generally* 33 U.S.C §§ 1251–1389.

TCEQ rules prescribe antidegradation standards for permitted discharges into three tiers of waterways.[6] The following two are relevant to high-quality waterbodies like Onion Creek:

> **Tier 1.** "Existing uses and water quality sufficient to protect those existing uses must be maintained. . . ."

> **Tier 2.** "[1] No activities subject to regulatory action that would cause degradation of waters that exceed fishable/swimmable quality are allowed [2] unless it can be shown to [TCEQ's] satisfaction that the lowering of water quality is necessary for important economic or social development. [3] Degradation is defined as a lowering of water quality by more than a de minimis extent, but not to the extent that an existing use is impaired. Water quality sufficient to protect existing uses must be maintained. [4] Fishable/swimmable waters are defined as waters that have quality sufficient to support propagation of indigenous fish, shellfish, terrestrial life, and recreation in and on the water."[7]

Under these standards, TCEQ may issue a waterway discharge permit to the City only if it has determined that the permitted activities would neither (1) disturb existing water uses nor (2) degrade the water.[8] In making that assessment, TCEQ employs both "narrative" (meaning

---

[6] 30 Tex. Admin. Code § 307.5(a), (b). The language in Texas's EPA-approved water-quality standards is similar but not identical to federal regulations. 40 C.F.R. § 131.12.

[7] 30 Tex. Admin. Code § 307.5(b)(1), (2). Tier 3 applies only to "outstanding national resource waters." *Id.* § 307.5(b)(3).

[8] *Id.* §§ 307.5(b)(1), (2); *see id.* §§ 307.7(b) (establishing categories of uses), .10(1) (App'x A) (assigning site-specific uses and criteria for classified segments, including Onion Creek).

4

qualitative) and "numeric" (meaning quantitative) criteria.[9]   Some water-quality parameters are subject only to general narrative criteria. For example, nutrients in permitted discharges, like total phosphorous (TP) and total nitrogen (TN), "must not cause excessive growth of aquatic vegetation that impairs an existing, designated, presumed, or attainable use."[10]  The permitting standards assign no specific numeric criteria to these nutrients.   But numeric criteria are applicable to various other water-quality parameters, including temperature, indicator bacteria, total dissolved solids, and—relevant here—dissolved oxygen (DO) concentrations.[11]

For classified segments like Onion Creek, general numeric criteria are superseded by site-specific criteria.[12]   For example, the general DO criteria for water with high aquatic life can range from a mean of 4.0 to 5.5 mg/L,[13] but the site-specific criterion for Onion Creek

---

[9] *Id.* §§ 307.4, .7, .10(a); *see id.* § 307.3(17) (defining "criteria" as "water quality conditions that are to be met in order to support and protect desired uses, i.e., existing, designated, attainable, and presumed uses"), (44) (defining "nutrient criteria" as "numeric and narrative criteria that are established to protect surface waters from excessive growth of aquatic vegetation"), (66) (defining "standards" as "desirable uses (i.e., existing, attainable, designated, or presumed uses as defined in this section) and the narrative and numerical criteria deemed necessary to protect those uses in surface waters").

[10] *Id.* § 307.4(e).

[11] *Id.* §§ 307.4, .7, .10; *see* 2010 IPs, *supra* note 1, at 56-57.

[12] 30 Tex. Admin Code §§ 307.4(a), .10(1) (App'x A) (Segment No. 1427, Onion Creek).

[13] *Id.* § 307.7(b)(3)(A)(i); *see id.* §§ 307.4(h)(2) ("Aquatic life use categories and dissolved oxygen criteria for classified segments are specified in Appendix A of § 307.10 of this title."), .10(1) (App'x A) ("Dissolved oxygen criteria are listed as minimum 24-hour means at any site within the segment. Absolute

5

is a mean of 5.0 mg/L.[14]  Modeling the City submitted in support of its permit application showed that the proposed discharge would likely cause DO to drop from levels exceeding 6.44 mg/L at critical temperature to at or just below 5.0 mg/L at the discharge point, while rising to baseline levels almost immediately thereafter.  The City believed this to be sufficient to meet Onion Creek's site-specific DO criterion.[15]

When TCEQ's Executive Director (ED) determined that the permit application was "administratively complete," the City provided public notice of its intent to obtain a permit.[16]  TCEQ then commenced a "technical review" of the application to ensure compliance with applicable water-quality standards, including the antidegradation

---

minima and seasonal criteria are listed in § 307.7 of this title unless otherwise specified in this appendix.").

[14] *Id.* § 307.10(1) (App'x A) (Segment No. 1427, Onion Creek) (designating site-specific uses and criteria for Onion Creek, including high aquatic-life use, minimum 24-hour mean DO, and maximum annual averages for chloride, sulfate, and total dissolved solids); *see id.* § 307.4(g)(2), (h)(2).

[15] The City's two QUAL-TX models predicted post-discharge DO levels of 5.04 mg/L and 4.87 mg/L.  The City's environmental engineer explained that the lower result was nonetheless "complian[t] with the assumed dissolved oxygen criterion of 5 mg/L, as TCEQ normally assumes a departure of 0.2 mg/L as compliant."  Whether any variance is allowable is the subject of dispute among the parties, but on the record before the Court, we need not, and therefore do not, consider the matter.

[16] *See* TEX. WATER CODE § 5.552(a), (b); 30 Tex. Admin. Code § 39.551.

rules.[17]  The review included DO modeling to predict how the proposed discharge would affect DO in the receiving waterways. TCEQ determined that the discharge permit would require more restrictive effluent limits than those proposed by the City—specifically, lower levels of nutrients (TP and TN) and increased levels of DO.  With these adjustments in place, TCEQ's modeling predicted that DO in Onion Creek would not reduce to less than 5.0 mg/L.  TCEQ also recommended adding a disinfection requirement to minimize any impact on the Barton Springs Salamander.

The ED issued a preliminary decision granting the application,[18] along with a draft permit incorporating the recommended adjustments, which the ED determined to be sufficient to protect existing uses and prevent degradation of water quality.  The draft permit also required the City to disinfect the wastewater through a dechlorination process before discharging it.  The City accepted these permit constraints and revised its application accordingly.

The Environmental Protection Agency (EPA) reviewed the draft permit and the City's revised application.[19]  The EPA also consulted with

---

[17] *See* TEX. WATER CODE § 5.553; 30 Tex. Admin. Code §§ 307.1–.10 (Texas Surface Water Quality Standards); 2010 IPs, *supra* note 1.  Certain sections of the 2010 IPs have not been EPA-approved.  *See* TCEQ, *Implementing the Texas Surface Water Quality Standards in Permitting*, https://www.tceq.texas .gov/permitting/wastewater/implementation (last visited Apr. 3, 2025).  As to those non-approved sections, which are not relevant here, TCEQ review was performed under the EPA-approved 2003 IPs.  Accordingly, we cite only to the 2010 IPs for convenience.

[18] TEX. WATER CODE § 5.553(a).

[19] *See* 33 U.S.C. § 1342(d) (providing EPA with authority to review and veto state approval of any discharge permit that does not comply with federal law).

the U.S. Fish and Wildlife Service (USFWS) based on the presence of the Barton Creek Salamander in the watershed.[20] In December 2016, the EPA issued interim objections requesting more information about "whether the state's analysis complied with TCEQ's antidegradation policy and implementation procedures for Tier 2 review." In January 2017, the EPA forwarded several additional questions following consultation with USFWS. After receiving a satisfactory response and supporting documentation from the ED, the EPA withdrew its objections in June 2017.[21] Referencing the "considerably more stringent" effluent limits developed during TCEQ's technical review—including "very low" TP and TN limits—the EPA determined that the Tier 1 and Tier 2 antidegradation standards were satisfied. Referencing TCEQ's DO modeling, the EPA definitively stated that any changes to the receiving water body would be "de minimis (i.e., less than noticeable)," "no significant degradation of water quality will occur," and "existing uses will be maintained in Onion Creek."

---

[20] 16 U.S.C. § 1536 (requiring federal agencies to consult USFWS during the permitting process to ensure endangered or threatened species are protected); 2010 IPs, *supra* note 1, at 21-22 (requiring notification to the USFWS when permit application screening indicates wastewater discharge has the potential to affect a listed species); *Memorandum of Agreement between TCEQ and U.S. EPA, Region 6 concerning the [National Pollutant Discharge Elimination System]*, section IV.D at 11-12 (June 12, 2020), https://www.tceq.texas.gov/downloads/permitting/wastewater/municipal/2020 -tpdes-moa.pdf (last visited Apr. 3, 2025) (requiring TCEQ to consult with USFWS during the permitting process to address potential endangered species issues in Texas Pollutant Discharge Elimination System permits).

[21] 33 U.S.C. § 1342(d)(2) (providing that no permit shall issue if EPA timely objects).

While the draft permit was under federal review, the City published a second notice about the ED's preliminary decision, which was set for a public meeting.[22] During the public-comment period, the ED received comments from 1,087 people related to the draft permit and provided 160 written responses.[23] In answer to several comments, the ED outlined the antidegradation review TCEQ undertook and explained why, in the ED's opinion, the draft permit met the Tier 1 and Tier 2 standards. After making additional changes to the draft permit in response to public comments, the ED approved the City's application in November 2017.

**B. Contested-Case and Judicial-Review Proceedings**

Scores of protestants, including SOS, requested a contested-case hearing to challenge the ED's preliminary decision and draft permit.[24] TCEQ granted the request, referred the matter to the State Office of Administrative Hearings (SOAH), and identified twelve issues for

---

[22] *See* TEX. WATER CODE § 5.553 (requiring the applicant to publish notice of the preliminary decision and TCEQ to provide by rule a public-comment period); 30 Tex. Admin. Code §§ 39.551 (rules governing public notice), 55.154 (establishing parameters for public meeting).

[23] *See* TEX. WATER CODE §§ 5.554–.555 (allowing the ED to hold one or more public meetings and requiring the ED to file "a response to each relevant and material public comment on the preliminary decision filed during the public comment period"); 30 Tex. Admin. Code §§ 39.420 (establishing rules for transmittal of ED's responses to public comments and decision to designated people), 55.156 (establishing rules for processing public comments).

[24] An "affected person" may request a contested-case hearing to challenge the ED's preliminary decision on the permit application. TEX. WATER CODE §§ 5.115, .555–.556. The applicant and the ED may also request a contested-case hearing on whether the application complies with all applicable statutory and regulatory requirements. *Id.* § 5.557(a), (b).

adjudication.[25]  Two settlement agreements resolved the dispute as to all protestants except SOS.  The settlement agreements extracted significant concessions from the City, some of which were then incorporated into the draft permit and others of which are enforceable through penalty provisions in the settlement agreements.  Among them, the City agreed to expand infrastructure (with an eye toward avoiding the necessity of any waterway discharges),[26] reduce the maximum

[25] *See* TEX. GOV'T CODE § 2003.047(e) (governing TCEQ action on a request for a contested-case hearing); 30 Tex. Admin. Code § 55.211 (same).  The issues designated for the contested-case hearing were: (1) whether the draft permit contains sufficient provisions to prevent nuisance odors, protect health of the requesters and wildlife in the area, and protect the requesters' use and enjoyment of their property; (2) whether the discharged effluent will violate the aesthetic parameters in the Texas Surface Water Quality Standards; (3) whether the draft permit will protect water quality and uses of the receiving waters under the applicable water-quality standards; (4) whether the proposed discharge will comply with the applicable antidegradation requirements; (5) whether the draft permit will protect groundwater in the area; (6) whether the draft permit should include a requirement for biomonitoring or Whole Effluent Toxicity testing; (7) whether the proposed treatment process can satisfy the effluent limits in the draft permit; (8) whether the modeling analysis of the proposed effluent discharge is sufficient; (9)  whether the draft permit will protect against the creation of algal blooms; (10) whether TCEQ should deny or alter the terms and conditions of the draft permit based on consideration of need under Water Code section 26.0282 and the general policy to promote regional or area-wide systems under Water Code section 26.081; (11) whether the City's compliance history raises issues regarding its ability to comply with the material terms of the permit that warrant denying or altering the terms of the draft permit; and (12) whether the City substantially complied with all applicable notice requirements.

[26] "Of significance, the City agreed to reduce the need to discharge treated water into Onion Creek by adding infrastructure so it could use more treated water to irrigate land and to increase its storage capacity to allow it to better regulate its discharges.  The City's administrator testified that the City's goal was to eliminate all or nearly all discharges into the waterway[.]"  668 S.W.3d 710, 722 n.10 (Tex. App.—El Paso 2022).  According to the City's administrator,

allowable discharge under the permit to 822,500 gallons per day, use an ultraviolet-light disinfection system rather than chlorine, and refrain from discharging any wastewater at all until wastewater volume exceeds 399,000 gallons per day. All told, the draft permit has some of the most stringent effluent limits of any waterway-discharge permit issued in the State of Texas.

Once the settlement agreements were finalized and the draft permit revised accordingly, the administrative hearing commenced with SOS as the sole protestant.[27] When TCEQ's administrative record was admitted into evidence, a rebuttable "presumption" arose that the draft permit (1) "meets all state and federal legal and technical requirements" and (2) will "protect human health and safety, the environment and physical property."[28] SOS attempted to rebut the presumption as to

the City's existing land-application permit requires disposal of wastewater on dedicated lands, which does not allow it to fully use the treated effluent on other land that needs water. She explained that the City's objective in securing the discharge permit is to conserve water resources and achieve an "aggressive" 100% beneficial reuse of wastewater by using the treated effluent to irrigate parks, medians, golf courses, and other areas rather than discharging treated effluent into a waterway. *See* 30 Tex. Admin. Code § 210.3(1) (defining "beneficial use" of wastewater); CITY OF DRIPPING SPRINGS, TEX., CODE OF ORDINANCES §§ 2.04.282, 22.06.007 (2024) (identifying the City's 100% beneficial-reuse goal and requiring developers to participate in the beneficial-reuse program).

[27] The other parties to the SOAH proceeding were the City, TCEQ's Office of Public Interest Counsel, and TCEQ's ED.

[28] TEX. GOV'T CODE § 2003.047(i-1)–(i-3) (laying out the "prima facie" case, means of rebuttal, and presentation of additional supporting evidence); 30 Tex. Admin. Code § 80.17(c) (same). The administrative record included the City's permit application, the draft permit, various technical memoranda, the EPA's withdrawal-of-objection letter, and the ED's statement of technical summary, response to public comment, and preliminary decision.

11

some but not all of the referred issues, and the ED and the City offered additional evidence, as they were entitled to do.[29] Because most of the adjudicated issues are not before this Court, we confine our discussion to the more relevant aspects of the underlying proceedings.

As to Tier 1, SOS argued that increased nutrient loading (TP and TN) from the permitted discharge would increase algal growth and cause a drop in DO levels that would negatively impact Onion Creek's existing and endangered aquatic species. SOS also cited one of the City's modeling results as demonstrating that the permit would disturb existing uses based on a projected dip in DO to 4.87 mg/L.[30] As to Tier 2, SOS urged that (1) expected changes in TP, TN, and DO levels are much more than de minimis and (2) a reduction in DO exceeding 10% constitutes degradation per se.

After considering documentary evidence, deposition testimony, and three days of live testimony from the parties' expert witnesses, the administrative law judge (ALJ) issued a proposal for decision (PFD) concluding that the draft permit complied with all requirements for issuance. The ALJ's proposed findings of fact and conclusions of law were accompanied by a 45-page explanation of the legal and evidentiary bases supporting the ALJ's determinations as to each of the referred issues.[31] Among other things, the ALJ determined that (1) the TP, TN,

---

[29] TEX. GOV'T CODE § 2003.047(i-2)–(i-3); 30 Tex. Admin. Code §§ 80.17(c)(2)–(3), .117.

[30] *See supra* note 15.

[31] *See* TEX. GOV'T CODE § 2003.047(l) (requiring the ALJ to make "separately stated" "findings of fact, conclusions of law, and any ultimate findings required by statute").

12

and DO effluent limits incorporated into the revised permit were adequate for the authorized discharges to survive Tier 1 and Tier 2 scrutiny; (2) TCEQ followed the appropriate antidegradation review procedures; and (3) the authorized discharge would comply with the applicable antidegradation requirements. As the ALJ explained, the competing evidentiary cases boiled down to a battle of the experts, and the ALJ found TCEQ's and the City's experts to be "more compelling and reliable" for a variety of reasons, including that SOS's experts "lacked experience on the applicable water quality standards and models used for evaluating the potential impact of wastewater discharges."

Germane here, the ALJ addressed and rejected SOS's "parameter-by-parameter" antidegradation approach as a misreading of TCEQ's antidegradation rules. The ALJ observed that the critical inquiry is whether there is a "lowering of water quality by more than a de minimis amount," not whether there has been a mere increase or decrease in TP, TN, and DO.[32] While increases in nutrients can "be the primary factor in lowering of water quality," "a mere increase, standing alone without additional evidence of its specific impact, does not equate to a lowering of water quality." In the same vein, although SOS considered the change in DO levels significant, SOS failed to show the change "correlate[d] to a lowering of water quality by more than a de minimis amount." On the contrary, the evidence supported the

---

[32] The ALJ provided an illustrative example: "[I]f background TP is .002 mg/L and the discharge would raise that level to .006 mg/L, this would be a tripling of TP levels—which is clearly more than de minimis. But, the impact on water quality from such a change in TP may be negligible, because both .002 mg/L and .006 mg/L may be extremely low."

13

conclusion that the nutrient and "DO levels in the draft permit are protective of aquatic life, and any changes have not been demonstrated to constitute a *lowering of water quality* in a significant way, which is the focus of a Tier 2 antidegradation review."[33]

After making minor changes to the ALJ's recommended findings and conclusions,[34] TCEQ issued its final administrative order granting the City's permit application. The final order included 142 findings of fact and 22 conclusions of law and expressly adopted the ED's written responses to the public comments.[35]

SOS sought judicial review of TCEQ's final order,[36] and the City intervened. In the judicial-review proceeding, the lower courts came to different conclusions about TCEQ's antidegradation review.[37] The trial court held that TCEQ missed the mark on both its Tier 1 and Tier 2 analyses and, on the pertinent point, summarily agreed with SOS that Tier 2 antidegradation review requires a parameter-by-parameter approach rather than a "whole water" approach. The court then concluded that the record established a Tier 2 violation as a matter of

---

[33] Emphasis in original.

[34] *See* TEX. GOV'T CODE § 2003.047(m) (generally authorizing TCEQ to amend the proposal for decision so long as the amendment is based on the administrative record and accompanied by an explanation); *Dyer v. TCEQ*, 646 S.W.3d 498, 511 (Tex. 2022) (holding that section 2003.047 allows TCEQ to revisit the record, reweigh the evidence, and revise the ALJ's findings).

[35] *See* TEX. WATER CODE § 5.557(c); 30 Tex. Admin. Code § 50.117(f).

[36] *See* TEX. GOV'T CODE § 2001.171; TEX. WATER CODE § 5.351.

[37] The lower courts also disagreed with one another about the sufficiency of the public notices, but that issue is not before this Court.

law because "undisputed" changes in TP, TN, and DO levels were more than de minimis. For that reason, the court reversed and enjoined the final order rather than remanding to the agency to rectify asserted deficiencies in the Tier 1 fact findings.

In a split decision, the court of appeals reversed and upheld the permit.[38] The majority held that, "under the statutes and rules . . . as they are written," substantial evidence supported TCEQ's determination that the discharge permit would neither lower Onion Creek's water quality nor impact its existing uses.[39] Like the ALJ, the majority dismissed SOS's parameter-by-parameter construction of the antidegradation policy, observing that both "the existing [Texas Surface Water Quality Standards] and the EPA-approved [implementation procedures] provide that an antidegradation review be conducted in a narrative or qualitative manner, considering several factors in determining the effect a proposed discharge will have on the receiving waters."[40] Accordingly, SOS could not "establish as a matter of law that a permit violates the antidegradation rules, whether under the Tier 1 or Tier 2 standards, simply by pointing to evidence that a proposed discharge would lead to numeric increases in the TP and TN levels in

---

[38] 668 S.W.3d 710, 716 (Tex. App.—El Paso 2022).

[39] *Id.* (holding that "TCEQ followed the controlling statutes and its own rules in resolving the fact intensive questions raised by the permit application"). The court's opinion scrupulously details the substantial evidence supporting TCEQ's findings and conclusions, *see id.* at 720, 727-38, but we need not do so to resolve the legal issues presented here.

[40] *Id.* at 738; *see supra* note 1; 33 U.S.C. § 1313(c) (governing EPA approval and triennial review of state water-quality standards).

the receiving water."[41]   For similar reasons, the majority dismissed SOS's argument that TCEQ was required, but failed, to afford conclusive weight to anticipated changes in Onion Creek's DO level.[42]

In opining that the permit failed under both tiers, the dissent employed a parameter-based analysis focusing only on evidence of nutrient increases that the ALJ had discounted.[43]   As the majority correctly observed, regardless of the proper antidegradation methodology, the applicable standard of review precludes treating such evidence as undisputed or binding on the reviewing court.[44]

## II.

The parties' debate about TCEQ's Tier 2 methodology is the principal issue before us.   Because SOS loses on that issue, we further address—and similarly reject—SOS's alternative argument that the final order is fatally defective under section 2001.141 of the Administrative Procedure Act (APA) based on TCEQ's failure to detail

---

[41] 668 S.W.3d at 738.

[42] *Id.* at 739.

[43] *See id.* at 743-44 (Palafox, J., dissenting) (concluding that the evidence established "a significantly large increase" in TP and TN levels that would, as a matter of law, endanger existing aquatic life and lower Onion Creek's water quality by more than a de minimis amount).

[44] *Id.* at 738 & n.17 (explaining that (1) any claim that nutrient levels would raise so significantly would require the court to accept expert-witness projections the ALJ declined to accept for reasons stated in the PFD and (2) doing so would be inappropriate under the applicable standard of review); *see* TEX. GOV'T CODE § 2001.174 (precluding the reviewing court from reweighing the evidence).

16

certain "underlying facts" SOS contends are required to support the final order's ultimate findings of fact.[45]

## A. Standard of Review

Under the APA, a court reviewing an agency's decision in a contested case "may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion."[46] But a reviewing court must "reverse or remand" when "substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are, among other things, (1) erroneous as a matter of law; (2) "not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole"; or (3) arbitrary, capricious, or characterized by abuse of discretion.[47] Each of the statutory grounds for reversal, including substantial-evidence review, is a question of law subject to de novo review.[48]

"Substantial evidence" is "a limited standard of review that gives significant deference to the agency in its field of expertise" and is, "[a]t its core . . . a reasonableness test or a rational basis test."[49] The issue is

---

[45] *See* TEX. GOV'T CODE § 2001.141(d).

[46] *Id.* §§ 2001.171, .174 (describing the standard of review "if the law does not define the scope of judicial review"); *see* TEX. WATER CODE § 5.351 (authorizing judicial review from a TCEQ decision without defining the scope of judicial review).

[47] TEX. GOV'T CODE § 2001.174(2).

[48] *Dyer v. TCEQ*, 646 S.W.3d 498, 505 (Tex. 2022).

[49] *Ammonite Oil & Gas Corp. v. R.R. Comm'n of Tex.*, 698 S.W.3d 198, 207 (Tex. 2024) (internal quote marks and citations omitted).

"not whether the agency's decision was correct, but only whether the record demonstrates some reasonable basis for the agency's action."[50] To prevent courts from "usurping the agency's adjudicative authority,"[51] an agency's findings, inferences, conclusions, and decisions are presumed to be sufficient unless the protestant proves otherwise.[52]

Arbitrariness is a distinct ground for reversal.[53] An agency acts arbitrarily or abuses its discretion if it fails to consider a mandatory factor, considers an irrelevant factor, considers appropriate factors but reaches a completely unreasonable result, or fails to follow its own regulations.[54] As SOS frames the issues, TCEQ's decision to grant the City's permit application is arbitrary and erroneous as a matter of law because TCEQ applied the wrong standard and substantial evidence does not support TCEQ's decision under the correct standard.

Many of SOS's arguments seem to attack TCEQ's water-quality rules as inconsistent with federal law,[55] but the question presented in

---

[50] *Mireles v. Tex. Dep't of Pub. Safety*, 9 S.W.3d 128, 131 (Tex. 1999).

[51] *N.E. Indep. Sch. Dist. v. Riou,* 598 S.W.3d 243, 251 (Tex. 2020) (internal quote marks and citation omitted).

[52] *Pub. Util. Comm'n of Tex. v. Tex. Indus. Energy Consumers*, 620 S.W.3d 418, 427 (Tex. 2021).

[53] *Id.*

[54] *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994); *Pub. Util. Comm'n v. Gulf States Utils.*, 809 S.W.2d 201, 207 (Tex. 1991).

[55] Neither party disputes that the EPA has determined that the relevant Texas standards comport with federal law. *See* 33 U.S.C. § 1313(a), (c) (requiring EPA approval and triennial review of state water-quality standards and implementation procedures for consistency with the Clean Water Act); 40 C.F.R. § 131.12 (setting minimum standards for compliance with federal law). The validity of that determination is not before us.

18

this state-law suit for judicial review is whether TCEQ followed the relevant Texas statutes and rules governing its permitting decision. We therefore ask only whether TCEQ followed its antidegradation rules as written, and we regard SOS's arguments only through that lens. That being so, the main issue turns on the proper construction and application of the antidegradation standards in 30 Texas Administrative Code section 307.5 and corresponding implementation procedures.[56] Agency rules are construed under well-established and well-known statutory construction principles that require enforcement according to the text's plain, technical, or defined language.[57]

SOS's secondary issue involves a dispute about the necessity of a "statement of the underlying facts" in the final agency order. This too presents a question of law resolved by statutory construction principles.[58] Our duty in all such matters is to adhere to the promulgated language "without adding to it or subtracting from it."[59]

### B. Tier 1 and Tier 2 Antidegradation Review

The Tier 1 and Tier 2 antidegradation standards differ but materially overlap. Both expressly require maintenance of existing uses and water quality sufficient to protect those uses.[60] Subject to an

---

[56] *See* 2010 IPs, *supra* note 1.

[57] *TCEQ v. Maverick County*, 642 S.W.3d 537, 544 (Tex. 2022).

[58] *Id.*

[59] *Id.* at 546.

[60] 30 Tex. Admin. Code 307.5(b); *see id.* § 307.3(27) (defining "existing uses").

exception not at issue here,[61] Tier 2 additionally prohibits any discharge activities that would cause "degradation" of waters that are cleaner than necessary "to support propagation of indigenous fish, shellfish, terrestrial life, and recreation in and on the water."[62] "Degradation" is defined as "a lowering of water quality by more than a de minimis extent, but not to the extent that an existing use is impaired."[63] A discharge that would impair existing uses flunks both standards. A discharge that lowers "water quality" more than nominally flunks Tier 2 even if existing uses are not disturbed.[64]

SOS argues that the draft permit fails both the Tier 1 and Tier 2 standards. It also argues that TCEQ erroneously "collapsed" the two inquiries by making fact findings that equate the Tier 1 and Tier 2 standards. The zone of disagreement between the parties has narrowed—at least for purposes of this appeal—to the authorized

---

[61] The Tier 2 standard allows TCEQ to authorize a discharge of pollutants that would degrade high-quality waters only if the agency is satisfied that "lowering of water quality is necessary for important economic or social development." *See id.* § 307.5(b)(2). Although TCEQ's final order includes several fact findings related to the City's "need" for the permit, the City has never invoked or relied on the exception. Rather, the question before us concerns the proper standard for determining whether a permitted discharge would cause degradation as defined in Tier 2, not whether a permit should issue despite degradation. Accordingly, we do not consider whether either the findings or the evidentiary record support the exception.

[62] *Id.* (defining "fishable/swimmable waters").

[63] *Id.*

[64] *See, e.g., de minimis*, BLACK'S LAW DICTIONARY, at 544 (11th ed. 2019); *de minimis*, NEW OXFORD AMERICAN DICTIONARY, at 461 (3d ed. 2010).

discharge's predicted impact on a single water-quality parameter: dissolved oxygen.[65]

SOS contends, first, that the draft permit does not satisfy Tier 1 as a matter of law, and therefore also fails Tier 2 as a matter of law, because one of the City's two DO models estimated that DO could drop below Onion Creek's site-specific 5.0 mg/L criterion to 4.87 mg/L. However, other modeling, including TCEQ's own modeling, projected that a minimum of 5.0 mg/L would be maintained under the worst-case scenario. Under the applicable standard of review, TCEQ was not required to accept the lowest of the City's results over its own modeling yields. On top of that, all the DO modeling was performed using the much higher level of discharge the City sought in its initial application (995,000 gallons/day) rather than the level TCEQ's final order authorizes (822,500 gallons/day). The difference in discharge volume makes TCEQ's DO projection even more conservative. Because substantial evidence supports TCEQ's determination that the authorized discharge would satisfy Onion Creek's site-specific DO criterion and would not disturb existing uses, SOS's Tier 1 complaint fails under the applicable standard of review.

SOS presents a more robust assault on TCEQ's determination that the permitted discharge would not degrade Onion Creek's water quality. The gist of the argument is that Tier 2 must prohibit a cognizable change in any single component of the water's chemical

---

[65] Although changes to TP and TN levels figured prominently in the dispute at the administrative and lower-court levels, no issues specific to nutrient loading are presented on appeal here.

21

composition because such a construction is (1) preordained by the Clean Water Act's "objective . . . to restore and maintain the chemical, physical, and biological integrity of the Nation's waters"[66] and (2) necessary to distinguish Tier 1 from Tier 2. SOS finds confirmation of such a granular approach in TCEQ's "Procedures to Implement the Texas Surface Water Quality Standards" (implementation procedures),[67] in select cases from other jurisdictions, and in certain EPA guidance that is external to the record.[68] We do not.

Tier 2's text is clear: degradation is a "lowering of water quality," not a "lowering of water-quality parameters" or "water-quality components" or "water-quality constituents."[69] By its plain language, Tier 2's focus is on "water quality," not the DO level or any other parameter standing alone. Instead of focusing on the *effect* the DO level has on Onion Creek's water *quality*, the antidegradation analysis SOS

[66] 33 U.S.C. § 1251(a); *see supra* notes 5 & 55.

[67] *See* 2010 IPs, *supra* note 1.

[68] *See* EPA, *Water Quality Standards Handbook Chapter 4: Antidegradation* Cover Page (2012) ("The [Handbook] does not impose legally binding requirements on the EPA, states, tribes or the regulated community, nor does it confer legal rights or impose legal obligations upon any member of the public. . . . This document does not constitute a regulation, nor does it change or substitute for any [Clean Water Act] provision or the EPA regulations."); Memorandum from Ephraim S. King, Dir., Office of Sci. and Tech., to EPA Water Mgmt. Div. Dirs., Regions 1–10 (Aug. 10, 2005) ("shar[ing] . . . OST's current recommendation regarding significance thresholds and lowering of water quality in high quality waters in the context of tier 2 antidegradation reviews" for the purpose of providing "the Regions with technical recommendations for your consideration as you work with states . . . and as you review antidegradation implementation methods that adopt significance thresholds").

[69] *See* 30 Tex. Admin. Code § 307.5(b)(2).

endorses focuses only on the DO parameter itself. The former, not the latter, is the approach the antidegradation rules prescribe.[70]

TCEQ's implementation procedures also do not support the methodology SOS favors. As those procedures confirm, water quality is composed of a complex set of ecological circumstances affected by several "parameters of concern," including but not limited to DO.[71] Other parameters—such as bacteria, phosphorus, nitrogen, turbidity, foam and froth, temperature, sulfate, chloride, pH, toxic pollutants, radioactive materials, taste and odor, suspended solids, oil, and grease— may also be considered in evaluating water-quality impact, along with "any other constituent that could lower water quality."[72] And while the implementation procedures provide methods for individually evaluating these components, that process is consistent with TCEQ's whole-body approach because assessing overall health necessarily begins with an evaluation of the parts.[73] The implementation procedures leave no doubt, however, that a parameter change is not the end of the matter.

---

[70] *See TCEQ v. Maverick County*, 642 S.W.3d 537, 541 (Tex. 2022) ("When a statute or rule defines its terms, courts should not construct a restated definition using alternative verbiage that adds or subtracts substantive requirements or limiting factors.").

[71] 2010 IPs, *supra* note 1, at 61-62; *see State Program Requirements: Approval of Application to Administer the National Pollutant Discharge Elimination System (NPDES) Program; Texas*, 63 Fed. Reg. 51164-01, 51193 (Sept. 24, 1998) ("EPA has not mandated whether States/Tribes apply 'Tier 2' on a parameter-by-parameter basis or on a waterbody-by-waterbody approach as Texas does. . . . The antidegradation review may initially focus on dissolved oxygen; however, all pollutants are subject to review.").

[72] *See* 2010 IPs, *supra* note 1, at 61-62.

[73] *Id.* at 55-69.

To the contrary, those procedures substantiate a qualitative whole-body approach that involves a somewhat subjective evaluation informed by both numerical and non-numeric information.[74]

The qualitative nature of the Tier 2 antidegradation assessment is best exemplified by the provisions discussing loss of a water body's "assimilative capacity."[75] In SOS's view, these portions of the implementation procedures support the conclusion that a reduction in DO from 6.44 mg/L to 5.0 mg/L is degradation as a matter of law. They do not. The procedures state:

> New discharges that use less than 10% of the existing assimilative capacity of the water body at the edge of the mixing zone are usually not considered to constitute potential degradation as long as the aquatic ecosystem in the area is not unusually sensitive to the pollutant of

---

[74] *See Wood v. TCEQ*, No. 13-13-00189-CV, 2015 WL 1089492, at *1, *5-6 (Tex. App.—Corpus Christi–Edinburgh, Mar. 5, 2015, no pet.) (affirming the TCEQ's decision to overrule the ALJ's recommendation because the ALJ applied an improper standard in requiring quantified evidence when the TCEQ measures antidegradation under the narrative standard); *see also TCEQ v. City of Waco*, 413 S.W.3d 409, 412 n.3 (Tex. 2013) (observing that a "qualitative" water-quality standard has been described as a "somewhat subjective assessment of 'too much,' in contrast to quantitative measures").

[75] 2010 IPs, *supra* note 1, at 64-66. The term "assimilative capacity" is not defined in Texas's water-quality regulations or the Clean Water Act. The IPs likewise provide no definition. EPA's online dictionary of environmental terms defines "assimilative capacity" as "[t]he ability of a natural body of water to receive wastewaters or toxic materials without harmful effects and without damage to aquatic life." EPA, *Terms & Acronyms*, https://sor.epa.gov/sor_internet/registrytermreg/searchandretrieve/termsandacronyms/search.do (last visited Apr. 3, 2025). A 2005 internal memo from the EPA's Office of Science and Technology, which SOS attached to its merits brief, defines the term as referring to "the difference between the applicable water-quality criterion for a pollutant parameter and the ambient water quality for that pollutant parameter where it is better than the criterion." Memorandum from Ephraim S. King, *supra* note 68.

24

concern. New discharges that use 10% or greater of the existing assimilative capacity *are not automatically presumed to constitute potential degradation but will receive further evaluation.*[76]

Importantly, although DO has numeric criteria, which would make it amenable to assimilative-capacity screening, the implementation procedures expressly state that "[t]his screening procedure is not applicable to dissolved oxygen."[77] More importantly, the implementation procedures are express in not considering such changes to individual parameters as establishing degradation but rather as requiring "further evaluation."[78] The numbers are what the numbers are, so any "further evaluation" means assessing such parameters *in connection with other considerations* affecting water quality.

What SOS seems to find most compelling on this topic is a provision in the procedures providing the following as one of the "[e]xamples where degradation is likely to occur":

> Increased loading of **oxygen-demanding substances** that is projected to decrease dissolved oxygen by more than 0.5 mg/L for a substantial distance in a water body that has exceptional quality aquatic life and a relatively unique and potentially sensitive community of aquatic organisms.[79]

In SOS's estimation, this provision proves not only that degradation of water quality is determined on a parameter-by-parameter basis but also that if a 0.5 mg/L projected decrease in DO is "likely" degradation, then

---

[76] 2010 IPs, *supra* note 1, at 64 (emphasis added).

[77] *Id.*

[78] *Id.*

[79] *Id.* at 66 (bolding in original).

a 1.44 mg/L projected decrease, like the one anticipated for Onion Creek, certainly is.

There are several flaws in SOS's extrapolated conclusion. First, the cited example refers to water that has "exceptional quality aquatic life" and a "relatively unique and potentially sensitive community of aquatic organisms," which Onion Creek does not.[80] Second, it applies when a 0.5 mg/L decrease is projected "for a substantial distance in a water body," not just at the discharge point. Third, and most importantly, the IPs expressly state that even under these circumstances, such a change in *exceptional* waters is only an *indicator* of potential degradation that requires *further evaluation*:

> The following examples are intended to provide general guidelines as to when degradation becomes likely. The examples *do not define degradation*, nor do they address all pollutants and situations that can cause degradation. *Final determinations are case-specific and can depend on the characteristics of the water body and local aquatic communities.* Lower increases in loading may constitute degradation in some circumstances, and higher loadings may not constitute degradation in other situations.[81]

Consistent with the water-quality standards, the implementation procedures describe a qualitative assessment of degradation based on

---

[80] 30 Tex. Admin. Code §§ 307.7(b)(3)(A) (Table 3) (describing waters with "exceptional aquatic life use" as having "exceptional or unusual" species assemblage, a habitat of "outstanding natural variability," and "exceptionally high" species richness and diversity while those waters with "high aquatic life use" have species assemblages of the "usual association of regionally expected species," a "highly diverse" habitat, and "high" species richness and diversity), .10(1) (App'x A) (Segment No. 1427, Onion Creek) (designating Onion Creek for high aquatic life use).

[81] 2010 IPs, *see supra* note 1, at 66 (emphases added).

overall water quality, rather than a granulated parameter-by-parameter approach. TCEQ perhaps could have adopted rules and standards implementing a parameter-by-parameter approach, but it did not. Instead, the antidegradation assessment allows TCEQ to make an informed judgment call as to whether any changes in the water body's chemistry lower water quality by more than a de minimis extent.[82] SOS may be uncomfortable with the latitude and discretion such an approach affords state regulators, but both the rules and the implementation procedures not only allow, but contemplate, a qualitative assessment on a whole-water basis.[83]

In support of SOS, some amici point to section 307.5(c)(2)(B) of the antidegradation rules as calling for a parameter-specific antidegradation review. That subsection, which discusses "[g]eneral provisions for implementing the antidegradation policy," says: "For dissolved oxygen, analyses of degradation under Tier 2 must utilize the same critical conditions as are used to protect instream criteria. For other parameters, appropriate conditions may vary."[84] But this only

---

[82] *See supra* note 74.

[83] We need not assess the extent to which any legal weight or binding force can be assigned to the implementation procedures, because even assuming those procedures have some force of law, SOS's interpretation of them fails on its own terms.

[84] 30 Tex. Admin. Code § 307.5(c)(2)(B). Joint amicus briefs supporting SOS were submitted by Friends of the Brazos River, Bayou City Waterkeeper, Coastal Watch Association, Environmental Stewardship, Friends of Hondo Canyon, Greater Edwards Aquifer Alliance, Port Aransas Conservancy, Texas Conservation Alliance, the Watershed Association, Ingleside on the Bay Coastal Watch Association, Hillcrest Residents Association, Protect Our

27

proves the point. The antidegradation policy recognizes that water quality is composed of a variety of parameters and that an antidegradation review necessarily starts by analyzing parameters of concern individually. Yet the Tier 2 standard is couched in terms of the whole, not the individual parameters. This is not to say that changes in a single parameter could never be significant enough to lower water quality, but the ultimate determination is TCEQ's to make based on an evaluation of the water's post-discharge quality.

SOS invokes the Clean Water Act's "objective" and "goals" and a couple of EPA guidance documents as supporting a contrary construction.[85] But SOS points to nothing that commands a parameter-based application of the Tier 2 standard.[86] Even assuming any of those things could be read in the way SOS suggests, none override

---

Blanco, and Granbury Fresh. The Homebuilders Association of Greater Austin submitted an amicus brief supporting TCEQ and the City.

[85] 33 U.S.C. § 1251 (Congressional declaration of goals and policy).

[86] The EPA has itself confirmed that "policies and guidance are not legal requirements," so TCEQ "is not bound to follow them exactly." *State Program Requirements*, *supra* note 71, at 51181. The EPA has more explicitly stated that "[a]lthough for the sake of national consistency EPA strongly encourages States implementing an NPDES program to do so in accordance with EPA policies and guidance, there is nothing in either the [Clean Water Act] or [EPA's regulations] that requires them to do so. Therefore, [TCEQ]'s statement in [its memorandum of agreement with EPA] that it will utilize EPA's policies and guidance only to the extent they do not conflict with Texas law or policy or [TCEQ] guidance is not in conflict with the requirements for NPDES authorization." *Id.*

what the Texas rules say. SOS also struggles to find supporting authority in the jurisprudence. The few cases it offers are not on point.[87]

Finally, SOS's complaint that TCEQ improperly "collapsed" the Tier 1 and Tier 2 standards is mistaken. SOS contends the final order focused only on whether the permit would protect existing uses, not on the distinct question of whether the permit would lower water quality in Onion Creek. By way of example, SOS points to Finding of Fact (FOF) 90, which states: "A Tier 2 review confirmed that no significant degradation of water quality is expected in Onion Creek, which has been identified as having high aquatic life uses, such that the existing uses will be maintained and protected." While TCEQ's Tier 2 findings refer to both degradation and existing uses, those are the words the standard employs. As the court of appeals observed, the "substantial overlap" in the Tier 1 and Tier 2 standards "mak[es] it difficult to analyze the two standards separately."[88]

---

[87] *See generally County of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 169 (2020) (rejecting claim that groundwater discharge was exempt from state permitting altogether because it discharged from a point source into navigable waters); *Arkansas v. Oklahoma*, 503 U.S. 91, 94-95 (1992) (involving a dispute about interstate water pollution); *Ky. Waterways All. v. Johnson*, 540 F.3d 466, 482-83 (6th Cir. 2008) (challenge to EPA approval of state antidegradation rules seeking to *categorically exempt* six types of pollution discharges from Tier 2 review); *Greater Yellowstone Coal. v. U.S. EPA*, No. 4:12-CV-60-BLW, 2013 WL 1760286, at *2 (D. Idaho Apr. 24, 2013) (challenge to EPA approval of state antidegradation rules enacting "an *automatic exemption* from Tier II antidegradation review if the additional pollution from a new activity would consume only 10% or less of the 'assimilative capacity' of a water body" (emphasis added)).

[88] 668 S.W.3d 710, 736 (Tex. App.—El Paso 2022).

Other fact findings confirm TCEQ's understanding and maintenance of the distinction, including FOF 78—"An antidegradation review ensures that a proposed discharge does not impair the uses or degrade the water quality of the receiving waters"—and FOF 88, which states: "The antidegradation requirements have been satisfied because (a) DO will be maintained at concentrations that support a healthy aquatic life community; [and] (b) a phosphorous limit has been imposed to assure that the proposed discharge will protect and maintain the water quality of water bodies that exceed fishable/swimmable quality . . . ." Besides that, the final order and evidence in the record more than adequately demonstrate that TCEQ applied the correct standard in conducting a Tier 2 review that evaluated both the impact on existing uses and the potential for degradation.[89] To the extent SOS faults the order for failing to use the definitional "no more than a de minimis extent" language in its findings, it was not required to do so. Tier 2's governing standard is "degradation" of "water quality." The findings and conclusions in the final order comport with what the rule requires.

## C. Compliance with APA Section 2001.141

We turn now to SOS's argument that TCEQ's final order is invalid because it lacks a statement of "underlying facts" to support several "ultimate" fact findings and conclusions of law.[90] APA section 2001.141

---

[89] *See id.* at 735.

[90] *See W. Tex. Utils. Co. v. Off. of Pub. Util. Couns.*, 896 S.W.2d 261, 270 (Tex. App.—Austin 1995, no writ) ("An agency's findings of fact fall into two categories: findings of basic fact and findings of ultimate fact. A finding of

30

requires a final agency order to include separately stated findings of fact and conclusions of law.[91] In addition, any fact finding "set forth in statutory language" must be accompanied by "a concise and explicit statement of the underlying facts supporting the finding."[92] Such findings need not take any particular form,[93] but "[p]roper underlying (basic) findings of fact" should be (1) "stated as the agency's findings" rather than as recitals of evidence or summaries of testimony and (2) "clear, specific, non-conclusory, and supportive of the ultimate statutory findings."[94] A statement of underlying fact findings must generally enable a reviewing court to "fairly and reasonably" say that the basic facts "support the statutorily required criteria."[95]

In addition to incorporating the ED's extensive responses to public comments, the final order includes more than two dozen fact findings devoted to addressing TCEQ's antidegradation review and

---

ultimate fact is reached by inference from basic facts."); *see also BFI Waste Sys. of N. Am., Inc. v. Martinez Env't Grp.*, 93 S.W.3d 570, 578 n.8 (Tex. App.—Austin 2002, pet. denied) ("The ultimate facts disputed during a contested case hearing do not always require detailed findings of underlying facts.").

[91] TEX. GOV'T CODE § 2001.141(b).

[92] *Id.* § 2001.141(d).

[93] *Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984) ("This Court has neither the right nor the authority to lay out a precise form of findings to be made by the Commission."); *accord Tex. Health Facilities Comm'n v. Presbyterian Hosp. N.*, 690 S.W.2d 564, 565-67 (Tex. 1985) (an agency order denying a "certificate of need" could not stand because the underlying fact findings were "mere recitals of evidence," conclusory, or did not support the ultimate fact findings).

[94] *Charter Med.-Dall.*, 665 S.W.2d at 452.

[95] *Id.* at 451.

compliance with applicable water-quality standards. Among them are various findings to the effect that (1) the ED performed the Tier 1 and Tier 2 antidegradation review in accordance with the applicable standards; (2) DO limits in the draft permit will protect Onion Creek's existing uses; (3) antidegradation requirements have been satisfied because "DO will be maintained at concentrations that support a healthy aquatic life community"; (4) Tier 2 review confirmed no significant degradation of water quality is expected; (5) Tier 2 review confirmed that existing uses will be maintained and protected; and (6) "[t]he proposed discharge will comply with the applicable antidegradation requirements." The ED's response to public comments further explains TCEQ's Tier 2 review and the ED's determination that "no lowering of water quality by greater than a de minimis amount is expected." SOS faults these findings, and the final order itself, for failing to elaborate more specifically about how the projected drop in DO concentrations and accompanying loss of assimilative capacity complies with Tier 1 and does not, consonant with Tier 2's degradation definition, constitute "a lowering of water quality by no more than a de minimis amount."[96] Although SOS contends the absence of a more particular

---

[96] According to SOS, the "minimally required findings of fact" for application of the Tier 2 antidegradation rule "include: (1) pre-discharge 'baseline' water quality of Onion Creek for both DO and the key nutrient pollutants, nitrogen and phosphorus; (2) post-discharge levels of these water quality parameters; (3) a comparison of the post-discharge levels over the baselines to determine how pollutant levels in the receiving waters were increased and water quality 'lowered'; and (4) a determination of whether this 'lowering' of water quality was more than *de minimis* and thus compliant with the controlling EPA rule."

explanation is fatal to the permit's issuance, this attack on the final order falls short for both procedural and substantive reasons.

First, SOS did not preserve the complaint for judicial review. SOS's motion for rehearing in the administrative proceeding did not assert that the agency had omitted the particular findings it now contends were required to support the final order. The motion's sprinkling of generalized complaints about the absence of "underlying fact findings" is insufficient in itself but even more so because those complaints were not linked to the specific fact findings assailed on appeal.[97] To preserve a complaint for judicial review, any noncompliance with the APA's fact-finding requirements must first be raised in the administrative proceeding "with the requisite degree of specificity."[98] Failure to present such an objection with at least the specificity the complaining party contends the agency was obligated to provide deprives the agency of "an opportunity to discover and correct the error, if any, or articulate a justification for its action."[99]

---

[97] *Hooks v. Tex. Dep't of Water Res.*, 645 S.W.2d 874, 880 (Tex. App.—Austin 1983, writ ref'd n.r.e.) (general complaints directed to findings the agency omitted were not stated with sufficient particularity to preserve them for judicial review). Although SOS's briefing here identifies the "minimally required findings of fact" with particularity, *see supra* note 96, the rehearing motion does not.

[98] *Hooks*, 645 S.W.2d at 879.

[99] *Id.* at 879-80 (omitted fact findings must be designated with particularity); *see BFI Waste Sys. of N. Am., Inc. v. Martinez*, 93 S.W.3d 570, 578-79 (Tex. App.—Austin 2002, pet. denied) (applicant failed to preserve complaint about omitted findings of fact and conclusions of law by failing to sufficiently identify the alleged omission in its motion for rehearing before the agency).

Second, underlying fact findings are not required because TCEQ's findings of fact are not set out in "statutory language."[100] The regulatory language contained in TCEQ's antidegradation rules is not statutory language for which underlying findings are required.[101] In arguing otherwise, SOS erroneously describes section 26.027 of the Water Code as establishing mandatory criteria that TCEQ must consider in conducting an antidegradation review. It plainly does not.

A statement of supportive facts is required "only when the ultimate fact finding embodies a mandatory fact finding set forth in the relevant enabling act" or when it "represent[s] the criteria the legislature has directed the agency to consider in performing its function."[102] Section 26.027 broadly authorizes TCEQ to "refuse to issue a permit when the commission finds that issuance of the permit would violate the provisions of any state or federal law or rule or regulation promulgated thereunder[.]"[103] As is immediately apparent, section 26.027 generally allows TCEQ to *deny* a permit that is *contrary* to any rule or law, but it neither states nor directs TCEQ to consider any

---

[100] *See* TEX. GOV'T CODE § 2001.141(d); *Charter Med.-Dall.*, 665 S.W.2d at 451 ("By limiting the fact-finding requirement to findings 'set forth in statutory language,' the legislature has expressed its intention in this matter.").

[101] *TCEQ v. Maverick County*, No. 03-17-00785-CV, 2022 WL 2960797, at *6 (Tex. App.—Austin July 27, 2022, no pet.).

[102] *Charter Med.-Dall.*, 665 S.W.2d at 451; *see W. Tex. Utils. Co. v. Off. of Pub. Util. Couns.*, 896 S.W.2d 261, 270 (Tex. App.—Austin 1995, no writ) ("An agency's finding of ultimate fact that does not embody a mandatory fact finding set forth in the relevant enabling act need not be supported by findings of basic fact, regardless of how conclusory the finding of ultimate fact may be.").

[103] TEX. WATER CODE § 26.027.

34

criteria in *granting* a permit nor mandates any fact findings at all. Section 26.027's language is nowhere close to the type of mandated criteria or findings that invoke the APA's "statement of underlying facts" requirement.

Our leading case on the matter illustrates the difference. In *Texas Health Facilities Commission v. Charter Medical-Dallas, Inc.*, the Legislature directed the agency to establish criteria for determining whether to grant a certificate of need for a proposed project.[104] In doing so, the Legislature specifically identified five criteria that "the commission must include" in its rules for making that determination.[105] We held that those mandated criteria, subsequently promulgated in the agency's rules, are the type of factors that fall within the scope of fact findings that must be accompanied by a statement of underlying facts.[106] In contrast, the Legislature's requirement that the agency *consider* six additional factors in *developing* additional criteria did not.[107] Although the agency also adopted those factors among its general criteria for reviewing certificate-of-need requests, the Legislature had not required it to do so.[108] For permissible waste discharges, section 26.027 of the Water Code does not mandate any specific findings, criteria, or factors

---

[104] *Charter Med.-Dall.*, 665 S.W.2d at 449 (citing subsection 3.10(a) of former TEX. REV. CIV. STAT. art. 4418h).

[105] *Id.* (citing subsection 3.10(b) of former art. 4418h).

[106] *Id.* at 451 & n.2.

[107] *Id.* at 449-50 & nn.1-2 (comparing the mandatory criteria prescribed in subsection 3.10(b) of former art. 4418h with the nonmandatory factors delineated in subsection 3.10(c)).

[108] *Id.* (citing subsection 3.10(c) of former art. 4418h).

for issuing a discharge permit.[109]  It certainly does not require the agency to make *negative* findings on the full panoply of laws and regulations that permit issuance would *not* offend.

To construe the statute as SOS wishes would result in an absurd extension of the APA's language that would infect every TCEQ order with potentially nullifying error for failing to identify and provide underlying findings of fact that a permit's issuance *complies* with *every* federal and state law, rule, and regulation.  Such a burden would be impossibly onerous and an unreasonable construction and application of the APA.[110]  Accordingly, we must and do reject it.

SOS once again leans heavily on the Clean Water Act's "objective" and "goals" of "maintaining the chemical, physical, and biological integrity of the Nation's waters,"[111] but it points to no statute that would require TCEQ to elaborate on what "de minimis" means or to explain why a predicted drop in a single water-quality parameter would not

---

[109] *Compare* TEX. WATER CODE § 26.027(a) *with*, *e.g.*, TEX. UTIL. CODE § 37.056(a), (c) (specifying required findings and criteria for granting or denying a certificate of convenience and necessity).

[110] Imposing such a burden on the agency is also contrary to the burden-shifting scheme in section 2003.47(i-1)–(i-3) of the Government Code. When the administrative record is filed, that statute recognizes a presumption that "the draft permit meets all state and federal legal requirements." TEX. GOV'T CODE § 2003.47(i-1).  To rebut the presumption, the protestant must present evidence that "the draft permit violate[s] a specifically applicable state or federal requirement." *Id.* § 2003.47(i-2).  Section 2003.47 negates any reading of section 26.027 as imposing an obligation on TCEQ to provide compliance findings when the protestant has not presented evidence that the permit violates a legal requirement that is "specifically applicable."  As TCEQ explains, the factfinders (the ALJ and TCEQ) are "not starting with a factual void to fill."

[111] 33 U.S.C. § 1251(a).

36

lower water quality by more than a de minimis extent. As we have explained above, the Tier 2 antidegradation standard relates to sustaining overall water quality, not maintaining individual parameter levels. Because the governing statutes do not require TCEQ to make findings for individual water-quality parameters in a Tier 2 review, no additional findings were required. The final order separately states TCEQ's findings of fact and conclusions of law and sufficiently informs the parties of the basis for its antidegradation decision. No additional findings or statements were required to comply with section 2001.141.

## III. Conclusion

In granting the City of Dripping Springs's wastewater discharge permit application, TCEQ did not violate either section 2001.141 or the antidegradation rules and implementation procedures. We therefore affirm the court of appeals' judgment upholding the permit's issuance.

John P. Devine
Justice

**OPINION DELIVERED:** April 11, 2025

37